UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
DOUGLAS CROMWELL, JR. AND
MARY CROMWELL,                                          Chapter 13
            DEBTORS.                                   Case No. 08-15944-WCH
_____

DOUGLAS CROMWELL JR. AND
MARY CROMWELL,
            PLAINTIFFS,
                                                       Adversary Proceeding
v.                                                     No. 09-1070

COUNTRYWIDE HOME LOANS, INC.
AND MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.,
            DEFENDANTS.
_____


**MEMORANDUM OF DECISION**

## I. <u>INTRODUCTION</u>

       The matters before the Court are the Second Amended Complaint (the "Complaint") filed

by Douglas Cromwell, Jr., and Mary Cromwell (collectively, the "Debtors") against

Countrywide Home Loans, Inc. ("Countrywide") and Mortgage Electronic Registration Systems,

Inc. ("MERS") (jointly, the "Defendants") alleging violations of the Massachusetts Consumer

Credit Cost Disclosure Act[1] (the "CCCDA"), as well as the Debtors' Objection to Proof of Claim

filed by Countrywide Home Loans, Inc. (the "Objection to Claim") and the Objection to

Confirmation of Second Amended Chapter 13 Plan (the "Objection to Confirmation") filed by

Countrywide.  Through their Complaint, the Debtors seek, *inter alia*, rescission of a refinancing

---

[1] Mass. Gen. Laws ch. 140D, § 1 *et seq.*

1

transaction and a declaration that the mortgage granted by them to MERS, as nominee for Countrywide, is void and that they have no tender obligation as a condition to effectuate the rescission.[2]   In the Objection to Claim, they, in turn, contend that Countrywide's claim is now unsecured in light of the Debtors' purported rescission.   The Defendants dispute the Debtors' allegations in the Complaint and object to the Debtors' Chapter 13 plan on the basis that they propose to treat Countrywide's claim as unsecured.   For the reasons set forth below, I will enter judgment in favor of the Debtors and order them to file a fee application within thirty days, sustain the Objection to Claim, and overrule the Objection to Confirmation.[3]

## II. <u>BACKGROUND</u>

In 1985, the Debtors inherited certain real property located at 27 Irving Street in Winchester, Massachusetts (the "Property") from Douglas Cromwell, Sr., free and clear of any encumbrances.[4]   The Property contains a single family home which has been the Debtors' principal residence since they inherited it.[5]   They reside there with their two children and, until his death in June, 2010, Douglas' mentally impaired uncle, Durant Cromwell.[6]

---

[2] Alternatively, the Debtors request that I certify the question of whether termination of the security interest is independent of any obligation the Debtors might have to tender funds back to Countrywide.  Plaintiffs' Post-Trial Memorandum, Docket No. 159 at fn. 21.  Unless otherwise stated, all docket references shall refer to the above-captioned adversary proceeding.

[3] This Memorandum of Decision constitutes my findings of fact and rulings of law made pursuant to Fed. R. Civ. P. 52, made applicable to adversary proceedings by Fed. R. Bankr. P. 7052.  Whether or not specifically referred to in this Decision, I have examined the submitted materials, weighed the credibility of the five witnesses, considered all thirty-eight exhibits introduced into evidence, and reviewed the entire record of this case.  Moreover, I take judicial notice of the docket in the adversary proceeding, as well as that of the main case pending before this Court. *See Rodi v. Southern New England School of Law*, 389 F.3d 5, 18-19 (1st Cir. 2004) (citations omitted).

[4] Joint Pre-Trial Statement, Docket No. 145 ("JPTS"), at ¶ II.2.

[5] *Id.* at ¶ II.1.

[6] *Id.* at ¶ II.3.  Trans. May 17, 2011 at 20:11-12.

Between September 19, 1991, and January 17, 2006, the Debtors executed thirteen mortgages with respect to the Property.[7]  Although the parties did not indicate whether each of these transactions refinanced and discharged prior existing mortgages or resulted in multiple mortgages, as of the petition date, the Debtors disclosed the existence of only two mortgages on the Property: a first mortgage held by MERS, as nominee for Countrywide, and a second mortgage held by "American General Finance."[8]  The Debtors executed the note (the "Note") ~~to~~ in favor of Countrywide in the original principal amount of $300,000 and granted a first mortgage (the "Mortgage") to MERS, as nominee of Countrywide, to secure the obligation on December 23, 2005.[9]  The purpose of this transaction was to refinance and discharge an existing obligation secured by a mortgage granted to New Century Mortgage Corporation ("New Century") in October, 2003.[10]   From the total proceeds of the Countrywide refinancing transaction, $264,960.08 was used to pay off the existing balance owed to New Century, while the Debtors used the balance to pay various other debts "incurred primarily for personal, household, or family purposes, and to make repairs to the Property."[11]

---

[7] Plaintiff's Ex. 1-2; Defendants' Exs. 6-17.  The Defendants also offered evidence that the Debtors were involved in an additional nine mortgage transactions with respect to a property located at 40 Harvard Street in Winchester, Massachusetts.  *See* Defendants' Exs. 19-27.

[8] Schedule D – Creditors Holding Secured Claims ("Schedule D"), Case No. 08-15944-WCH, Docket No. 7.  *See also* Plaintiffs' Ex. 1-2; Defendants' Ex. 17.  I further note that the Debtors have also commenced a second adversary proceeding against American General Financial Services, Inc., seeking rescission of the second mortgage. *See* Adv. P. No. 09-1102.

[9] JPTS at ¶¶ II.4, 9.

[10] *Id.* at ¶¶ II.5-6.

[11] *Id.* at ¶¶ II.6-8; Defendants' Ex. 28.  The HUD-1 Settlement Statement for the December 23, 2005, refinancing transaction reflects that Countrywide, not New Century, received $264,960.08 from the closing.  Defendants' Ex. 28.  After being directed to clarify this inconsistency, the parties have explained that Countrywide received the funds because Countrywide serviced the prior loan on behalf of New Century.  *See* Docket. No. 162.

Unable to keep up with the payments due under the Note, the Debtors entered into two loan modification agreements with Countrywide.[12]  The first, dated March 16, 2007, increased the unpaid principal balance to $317,721.93.[13]  The second, dated December 5, 2007, again increased the unpaid principal balance to $334,295.15.[14]  The parties stipulated that the Debtors made only nine regular monthly payments and last made a payment on September 16, 2008.[15]

On August 8, 2008, the Debtors filed a joint Chapter 13 petition.[16]  On Schedule A – Real Property ("Schedule A"), the Debtors listed the Property as having a current value of $388,600, subject to secured claims in the amount of $350,117.45.[17]  The Debtors disclosed secured claims in the amount of $334,200.15 and $13,866.69 owed to Countrywide and American General Finance, respectively, on Schedule D.[18]  Schedule D also reflected secured claims held by the Town of Winchester for unpaid property taxes in the amount of $1,052.25 and water and sewer charges in the amount of $998.36.[19]  On their original Schedule C – Property Claimed as Exempt ("Schedule C"), the Debtors claimed an exemption in the Property pursuant to Mass. Gen. Laws ch. 188, § 1 in the amount of $39,534.80 (the "Homestead Exemption"), which appears to be the approximate amount of equity that remained in the Property as of the petition date.[20]  The

---

[12] JPTS at II.18.

[13] *Id.* at II.19; Defendants' Ex. 29.

[14] JPTS at II.20; Defendants' Ex. 30.

[15] JPTS at II.29-30.

[16] *See* Case No. 08-15944-WCH, Docket No. 1.

[17] Schedule A – Real Property ("Schedule A"), Case No. 08-15944-WCH, Docket No. 7.

[18] Schedule D, Case No. 08-15944-WCH, Docket No. 7.

[19] *Id.*

[20] Schedule C, Case No. 08-15944-WCH, Docket No. 7.

Debtors also listed a priority federal tax claim in the amount of $318.80 on Schedule E –
Creditors Holding Unsecured Priority Claims ("Schedule E"), and general unsecured claims
totaling $68,887.71 on Schedule F – Creditors Holding Unsecured Nonpriority Claims
("Schedule F").[21]   The Debtors did not list any claims against Countrywide or MERS on their
Schedule B – Personal Property ("Schedule B").

The meeting of creditors held was held pursuant to 11 U.S.C. § 341(a) on September 23,
2008, as scheduled and concluded the same day.  On October 3, 2008, Countrywide filed a proof
of claim indicating that, as of the petition date, the total amount of the secured claim was
$359,110.65 with a prepetition arrearage of $25,431.01.[22]   Initially, the Debtors proposed to cure
the prepetition arrearage on Countrywide's claim through their Chapter 13 plan while
maintaining their regular post-petition payments.  Shortly after Countrywide filed a motion
seeking relief from the automatic stay, however, the Debtors' position with respect to the claim
abruptly changed.

On January 21, 2009, the Debtors, through counsel, sent written notification to the
Defendants' counsel of their election to rescind the Countrywide refinancing transaction.[23]   On
the same date, the Debtors filed the Objection to Claim, contending that, in light of their
purported rescission, Countrywide held only an unsecured claim.[24]   The Defendants disputed the
validity of the Debtors' rescission, and to date, have neither taken any action to terminate the

---

[21] Schedules E and F, Case No. 08-15944-WCH, Docket No. 7.

[22] Case No. 08-15944-WCH, Claim No. 5-1.  Countrywide later filed a further amended proof of claim on April 23, 2009.  *See* Case No. 08-15944-WCH, Claim No. 5-2.

[23] JPTS at ¶ II.14; Defendants' Exs. 31-32.

[24] Objection to Claim, Case No. 08-15944-WCH, Docket No. 28.

security interest nor return any money or property to the Debtors.[25]   As a result, the Debtors commenced the present adversary proceeding on February 20, 2009, asserting that they can rescind the Countrywide refinancing transaction because they were not provided with the correct number of copies of the Notice of Right to Cancel (the "NORC") under the CCCDA ("Count I"), and that the NORC provided to them at the closing did not adequately disclose their rescission rights because it used the wrong statutory form ("Count II").   Ultimately, the Objection to Claim was consolidated with this adversary proceeding.

Three days after the commencement of the adversary proceeding, the Debtors filed a "Notice of Amendment to Schedule B; Schedule C; Schedule D; Schedule F; Schedule I; and Schedule J," (the "Notice of Amendment") and a further amended Chapter 13 plan.[26]   In summary, the Debtors amended these schedules to reflect their new position with respect to their purported rescission by disclosing their CCCDA claim on Schedule B, reclassifying the debt owed to Countrywide as a secured claim on Schedule D to an unsecured claim on Schedule F, and treating it as a general unsecured creditor in their amended Chapter 13 plan.[27]   Additionally, the Debtors sought to amend Schedule C to increase their Homestead Exemption to the full $500,000 provided under Massachusetts law.[28]   Notably, the certificate of service for the notice of amendment indicated that it was "served via ECF upon the following: Carolyn Bankowski, Chapter 13 Trustee, Office of the United States Trustee, and all other parties and entities that receive notice in this matter by ECF," without specifically listing the names or addresses of all

---

[25] JPTS at II.15-17.

[26] *See* Second Amended Chapter 13 Plan, Case No. 08-15944-WCH, Docket No. 51; Notice of Amendment, Case No. 08-15944-WCH, Docket No. 55.

[27] Notice of Amendment, Case No. 08-15944-WCH, Docket No. 55.

[28] *See* Mass. Gen. Laws ch. 188, § 1.

those served.[29]   Nonetheless, the ECF system reflects that Countrywide received electronic

service of the Notice of Amendment through its counsel.

Between May 17, 2010, and September 10, 2010, the parties each sought judgment in the

adversary proceeding by filing various motions for partial summary judgment.  At the same time,

the Debtors filed a motion to certify the following questions of law to the Supreme Judicial Court

of Massachusetts (the "Motion to Certify Question"):

> When a consumer prevails in establishing the right to rescind a mortgage loan
> transaction pursuant to G.L. c. 140D, §10(a) and 209 CMR 32.23(1), is the
> security interest voided by operation of law without regard to any obligation
> which the consumer may have pursuant to G.L. c. 140D, §10(b) and 209 CMR
> 32.23(4)(c) to tender money and property to the creditor?  Alternatively, does a
> successful rescission action provide the trial court with equitable discretion to
> void the security interest irrespective of any tender obligation which the consumer
> may have?[30]

After numerous continuances at the request of the parties, I finally heard the cross-motions for

summary judgment and Motion to Certify Question on December 8, 2010.  At the conclusion of

oral arguments, I granted Countrywide summary judgment on Count III of the Complaint with

the consent of the Debtors, but denied both parties summary judgment with respect to all other

counts, finding that genuine issues of material fact remained.[31]  Additionally, I declined to certify

the Debtors' question because it was ultimately an issue of bankruptcy law over which the

Supreme Judicial Court has no jurisdiction.

---

[29] Notice of Amendment, Case No. 08-15944-WCH, Docket No. 55.

[30] Motion to Certify Question, Case No. 05-15944-WCH, Docket No. 21.

[31] Count III of the Second Amended Complaint alleged that the Debtors were entitled to rescind the refinancing
transaction because the finance charge disclosed was inaccurate beyond any tolerance permitted by law because it
improperly omitted certain closing costs which were not bona fide or reasonable.  After additional discovery
conducted prior to the December 8, 2010 hearing on the motions for summary judgment, the Debtors concluded that
that this count was not legally sustainable and agreed that I should enter judgment for Countrywide on Count III.

In the meantime, the Debtors filed their Third Amended Chapter 13 Plan (the "Plan") on September 27, 2010. Through the Plan, the Debtors proposed to pay $322 for the 11 remaining months of their 36 month plan, having already made payments totaling $18,959.[32] The only secured claim treated through the Plan was the Town of Winchester's claim for water and sewer charges in the amount of $998.36,[33] but the Debtors also proposed to pay a priority claim in the amount of $241.75 on account of a federal income tax debt and an administrative expense of $7,000 to their bankruptcy counsel.[34] With respect to the general unsecured claims, the Plan provides that after the payment of all priority and administrative claims, including the Chapter 13 trustee's fee, the general unsecured creditors with claims totaling $459,153.30, consisting of the outstanding balances on both mortgagee's claims, general unsecured proofs of claim totaling $10,998.77, and student loans in the amount of $74,877.19, shall receive a dividend from the remaining funds paid into the Plan.[35] According to the Debtors' calculation, the funds remaining for the general unsecured creditors would be $12,021.31, yielding a dividend of approximately 2.6%.[36] The Debtors' liquidation analysis concluded that, in light of the property claimed as exempt on Schedule C, there would be no distribution to unsecured creditors in a Chapter 7 case.[37]

---

[32] Third Amended Chapter 13 Plan, Case No. 08-15944-WCH, Docket No. 97.

[33] *Id.* The Plan inconsistently lists the amount of this claim, which is the only secured claim being paid through the plan, as $998.36, but the total secured claims are listed as $986.36 in Section II.A and $988.36 in Section VII. While this discrepancy must be addressed prior to confirmation, it does not impact my analysis of the issues now before me.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

On October 27, 2010, Countrywide Home Loans Servicing, L.P.,[38] filed the Objection to Confirmation on the basis that the Plan proposes to treat Countrywide's claim as unsecured despite the fact that there has been no determination that the refinancing transaction was properly rescinded.[39]   When the Debtors failed to timely respond, I sustained the Objection to Confirmation and ordered them to file a further amended plan.   On November 16, 2010, however, the Debtors filed a motion to reconsider, arguing that they were unaware that they were required to respond to the Objection to Confirmation and requesting that it be consolidated with the adversary proceeding.  I granted the motion to reconsider the following day.

On May 17, 2011, I conducted a trial at which five witnesses testified and thirty-eight exhibits were introduced into evidence.  The testimony elicited largely concerned the number of copies of the NORC the Debtors received at the closing and may be summarized as follows.

The Debtors testified that the closing of the Countrywide refinancing transaction took place at an office park in Burlington, Massachusetts.[40]  The Debtors sat at a conference table with Countrywide's closing attorney, later identified as Dustina M. Bennett ("Attorney

---

[38] In the Objection to Confirmation, Countrywide Home Loans Servicing, L.P., purports to be the current holder of the Note and Mortgage.  Case No. 08-15944-WCH, Docket No. 106 at ¶ 3.  In the Joint Pre-Trial Statement filed approximately six and one half months after the Objection to Confirmation, the Defendants represent that MERS is the current holder of the Mortgage and that it has never been assigned.  JPTS at ¶ II.10.  The is precisely the type of sloppy mistake that is pervasive in the mortgage industry and inexcusably drains judicial resources.  Because no evidence of an assignment of either the Note or Mortgage was attached to the Objection to Confirmation, Countrywide Home Loans Servicing, L.P., has not taken any action to be substituted as a defendant or otherwise intervene in the adversary proceeding despite the consolidation of its Objection to Confirmation, and the Joint Pre-Trial Statement substantially post-dates the Objection to Confirmation, I assume that the statement contained in the Objection to Confirmation is erroneous.

[39] Objection to Confirmation, Case No. 08-15944-WCH, Docket No. 106.

[40] Trans. May 17, 2011 at 21:14-20.

Bennett"), who presented them with a packet of closing documents.[41]  Bennett then "went over"

each document in the packet and gave it to the Debtors to sign.[42]

Among the documents presented to the Debtors was the NORC.  Although Countrywide

was not the lender under the existing note and mortgage,[43] it is undisputed that the form of

NORC used by Countrywide was model form H-9[44] provided in Regulation Z,[45] the enabling

regulations for the federal Truth in Lending Act,[46] and titled "RESCISSION – SAME LENDER

REFINANCE."[47]  The NORC provided in relevant part:

> YOUR RIGHT TO CANCEL
> You are entering into a new transaction to increase the amount of credit
> previously provided to you.  Your home is the security for this new transaction.
> You have a legal right under federal law to cancel this new transaction, without
> cost, within THREE BUSINESS DAYS from whichever of the following events:
>
> (1)  The date of this new transaction, which is 12/23/2005_____; or
> (2)  The date you received your new Truth in Lending disclosures; or
> (3) The date you received this notice of your right to cancel.
>
> If you cancel this new transaction, it will not affect any amount that you
> presently owe.  Your home is the security for that amount.  Within 20 calendar
> days after we receive your notice of cancellation of this new transaction, we must
> take the steps necessary to reflect the fact that your home does not secure the
> increase of credit.  We must also return any money you have given to us or
> anyone else in connection with this new transaction.

---

[41] *Id.* at 22:7-25; 23:1-4.

[42] *Id.* at 23:1-4.

[43] JPTS at II.12-13.

[44] 12 C.F.R. Pt. 226, App. H-9.

[45] 12 C.F.R. § 226.1 *et seq.*

[46] 15 U.S.C. § 1601 *et seq.*

[47] JPTS at ¶ II.11.

> You may keep any money we have given you in this new transaction until we
> have done the things mentioned above, but you must then offer to return the
> money at the address below. . . .[48]

The bottom of the NORC contained the following acknowledgment (the "Acknowledgment")

and an area for the borrowers' signatures:

> The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT
> TO CANCEL and one copy of the Federal Truth in Lending Disclosure
> Statement.[49]

Even though the Debtors now contend to have only received one copy of the NORC, they freely

admit that they signed the Acknowledgment, explaining that they did so simply because they

were asked to do so by Attorney Bennett.[50]

  While Attorney Bennett had no recollection of this particular closing, she testified that

she has performed thousands of closings and each time adheres to the same procedure based

upon Countrywide's closing instructions.[51]   Upon receipt of the closing documents from the

lender, she reviews the packet to ensure that no documents are missing and prepares a copy for

the borrowers.[52]  If any documents are missing, or if the packet does not include the appropriate

number of copies of the NORC, Attorney Bennett obtains the missing documents or makes

additional copies of the NORC for the borrowers prior to the closing.[53]   At a closing, after

confirming the identity of the borrowers and that they are signing the documents under their own

free will, Attorney Bennett presents the lender's documents to the borrowers and explains each

---

[48] Defendants' Ex. 1; Plaintiffs' Ex. A.

[49] *Id.*

[50] Trans. May 17, 2011 at 37:1-12; 39:9-13, 17-20; 82:17-22.

[51] *Id.* at 143:22-25; 144:1-6; 155:16-23; 159. *See* Defendants' Ex. 33.

[52] *Id.* at 146:15-25; 147:1-19.

[53] *Id.* at 149:14-23; 152:18-25; 153:1-12; 154:5-25; 156:7-11.

one before asking them to sign.[54]  With respect to the NORC, she explains to the borrowers that they have a right to cancel the mortgage transaction within three business days and may do so by signing the cancellation portion of the NORC and sending it to the listed address.[55]  Attorney Bennett does not, however, explain the consequences of rescission.[56]  Indeed, she also testified that she was unaware that different rescission forms were used in same lender refinancing transactions and did not notice the title on the one used here.[57]  Although she does not hand the borrowers their copies of the NORC at the time they sign the Acknowledgment, she represents to them that they will receive the appropriate number of copies in their packet at the end of the closing.[58]

The closing lasted approximately forty-five minutes to one hour.[59]  At the end, Bennett gave the Debtors a folder with unsigned copies of the closing documents approximately one inch thick.[60]  After the closing, the Debtors drove directly home and Douglas placed the folder in the bottom drawer of a file cabinet in their dining room.[61]  The folder remained in the file cabinet until January, 2009, when Douglas removed it to bring it to the office of attorney Richard Blumenthal ("Attorney Blumenthal"), the Debtors' bankruptcy counsel, to discuss

---

[54] *Id.* at 142:18-25.

[55] *Id.* at 157.

[56] *Id.* at 174:8-16.

[57] *Id.* at 180:23-25; 181:1-8.

[58] *Id.* at 159:4-14; 169:5-8.

[59] *Id.* at 23:5-7.

[60] *Id.* at 23:8-20.

[61] *Id.* at 24:23-25; 25:1-21; 102:7-9; 104:11-23.

Countrywide's commencement of foreclosure proceedings.[62]  The Debtors testified that, to the best of their knowledge, neither they, nor anyone else, ever looked at the documents contained within the folder prior to their meeting at Attorney Blumenthal's office.[63]  Nonetheless, Mary testified that she understood her right to cancel the transaction and considered doing so within the three business days of the refinancing transaction.[64]

Upon arrival at Attorney Blumenthal's office, he reviewed the closing documents and observed that only one copy of the NORC was present in the folder.[65]  Attorney Blumenthal then asked a real estate attorney at his firm, Lisa Darman ("Attorney Darman"), to review the documents to see if she saw anything unusual.[66]  She too found only a single copy of the NORC.[67]  In light of this discovery, Attorney Blumenthal referred the Debtors to Attorney Kenneth Quat ("Attorney Quat"), who specializes in Truth in Lending cases.  After the meeting, the Debtors returned the folder to the file cabinet.[68]

At the conclusion of the trial, I took the matter under advisement and ordered the parties to file post-trial briefs, which they both did on June 24, 2011.  As noted above, the Debtors included a request that I reconsider my decision on the Motion to Certify Question in a footnote

---

[62] *Id.* at 26:2-13; 27:3-23.

[63] *Id.* at 31:14-25; 32:1-4; 80:2-20; 88:14-19.

[64] *Id.* at 88:3-13.

[65] *Id.* at 28-31; 111:10-13.  At trial, Attorney Blumenthal testified that he could not remember whether the closing folder was clipped or bound, but admitted that he testified that they were not at a prior deposition.  *Id.* at 121:20-25; 122:1-10.

[66] *Id.* at 111:1-9; 7-25; 113:1-13.  Attorney Blumenthal and Attorney Darman gave inconsistent accounts as to whether Attorney Blumenthal specifically identified the number of copies of the NORC as being an issue when he asked her to review the closing documents.  *Id.* at 112:19-24; 133:6-20.

[67] *Id.* at 114:17-25; 115:1-9; 129:1-24.

[68] *Id.* at 31:2-10.

in their Post-Trial Memorandum.  The parties have also stipulated to the following figures with

respect to Countrywide's loan:

21.  On the basis of the most recent loan modification agreement, the principal loan balance as of May 2, 2011 is $333,954.47.

22.  The amount of interest due on the Countrywide Loan as of May 2, 2011 (calculated from December 1, 2007 through May 16, 2011) is $96,699.16.

23.  The total amount of fees due as of May 2, 2011 is $1,408.58.

24.  The total escrow balance due as of May 2, 2011 is $14,883.09.

25.  Plaintiffs have paid a total of $19,515.10 which has been applied to loan interest.

26.  Plaintiffs have paid a total of $136.82 which has been applied to loan late charges.

27.  Plaintiffs have paid a total of $4,529.59 which has been applied to the escrow account on the Countrywide Loan.

28.  Plaintiffs have paid a total of $24,181.51 on the Countrywide Loan.

* * *

31.  Plaintiffs paid a total of $12,805.00 to Countrywide and third parties in connection with obtaining the Countrywide Loan.   The amounts paid to Countrywide are itemized as follows: loan discount (points) - $9,375.00; tax service fee - $79.00; processing fee - $675.00.

32.  The amounts paid to third parties are as follows: appraisal fee - $505.00; credit report fee - $35.00; flood check fee - $26.00; title examination fee - $295.00; attorney's fees - $650.00; title insurance premium - $825.00; recording fees - $175.00; obtain and record municipal lien certificate - $90.00; Federal Express and preparation fee - $75.00.

$10,970 of the $12,805.00 total consists of prepaid finance charges.  $1,835.00 of this total consists of amounts excludable from the calculation of the finance charge for the Countrywide Loan . . . .[69]

---

[69] JPTS at II.21-28, 31-32.

### III. POSITIONS OF THE PARTIES

The Debtors

First, the Debtors assert that they did not each receive two copies of the NORC.  While the Debtors concede that they signed the Acknowledgment indicating that they had, they contend that no presumption of adequate delivery arises in this case because it is undisputed that Attorney Bennett had not actually given them any copies of the NORC at the time they signed.  Moreover, they argue that language of the Acknowledgment can only reasonably be read to mean that the Debtors acknowledged receipt of "two copies" total.

If there is a presumption of delivery in this case, the Debtors assert that it was rebutted because all that is required is evidence to the contrary.  Here, they testified that after the closing, they placed the folder of closing documents in their filing cabinet for safekeeping, and that no one removed it or even looked at it until they met with Attorney Blumenthal, at which time only one copy of the NORC was found in the folder.  Accordingly, they contend the burden then shifted to Countrywide to prove they each received two copies of the NORC.

Once the burden shifted, the Debtors stress that Countrywide did not present evidence establishing that they each received two copies of the NORC.  They note that their testimony at trial was specific, consistent, and uncontroverted, while Countrywide's only witness, Attorney Bennett, could not recall anything about the closing in question.  The Debtors further argue that Attorney Bennett's testimony regarding her usual practice cannot trump such specific, credible testimony.  They also suggest that her testimony should be discounted because it is incredible that Attorney Bennett would be unaware of the different requirements for same lender refinancing transactions.[70]

---

[70] The Debtors also contend that I should draw an adverse inference from the fact that Countrywide failed to call any other witnesses from either Attorney Bennett's law firm or Countrywide who were involved in preparing the closing

Because Countrywide failed to provide two copies of the NORC to each Debtor, they argue that Countrywide violated the requirements of 209 C.M.R. § 32.23(2)(a), giving rise to an extended right to rescind.  To the extent that the Defendants rely on *King v. Long Beach Mortg. Co.*[71] and its progeny[72] for the proposition that providing only a single NORC does not give rise to a right to rescind, the Debtors assert that *King* was wrongly decided because the use of the singular form of "notice" in 12 C.F.R. § 226.23(a)(3), the federal analogue to 209 C.M.R. § 32.23(1)(c), was not meant to override the two copy requirement otherwise contained in the regulations and Official Staff Commentary.  Alternatively, the Debtors contend that *King* is inapposite because that case only involved one plaintiff, where here they received only one NORC total, allowing at least one of them to rescind the loan.

Second, the Debtors argue that, regardless of how many copies of the NORC they received, Countrywide failed to clearly and conspicuously disclose the effects of rescission by using the incorrect model form, thereby extending the right to rescind.  Because the form used in this case is intended for a same lender refinancing transaction, they contend it grossly misrepresents the effects of rescission by stating that rescission would not affect any amount that they presently owe and that Countrywide would have to take steps to reflect that their home does not secure the increase of credit, when, in fact, the entire amount of the loan would be rescinded

---

documents.  As it is doubtful that such persons would have any specific recollection of this transaction, I must disagree.

[71] *King v. Long Beach Mortg. Co.*, 672 F.Supp.2d 238 (D. Mass. 2009).

[72] *See Ferreira v. Mortg. Elec. Registration Sys., Inc.*, No. 09-11394-NMG, 2011 WL 1842864 *5 (D. Mass. May 16, 2011); *McKenna v. Wells Fargo Bank, N.A.*, No. 10-10417-JLT, 2011 WL 1100160 *2 (D. Mass. Mar. 21, 2011); *McDermott v. Mortg. Elec. Registration Sys., Inc.*, No. 08-12121-GAO, 2010 WL 3895460 *7 (D. Mass. Sept. 30, 2010).

and the entire security interest would be void.  The Debtors state that all reported decisions have come to this conclusion.[73]

In light of either of these violations, the Debtors contend that their right to rescind the Countrywide refinance transaction was extended and that they validly exercised that right.  As a result of this rescission, they assert that the current loan balance is $266,928.27.  The Debtors arrive at this number by starting with the loan balance of $333,954.47 at the time of the parties' second loan modification and deducting the following amounts: $19,515.10 paid by the Debtors and applied to loan interest; $136.82 paid by the Debtors and applied to late charges; $4,529.59 paid by the Debtors and applied to the loan escrow account; $12,805 paid by the Debtors to third parties in connection with obtaining the Countrywide loan; and $30,039.69 of accrued interest which had been added to the principal for modification purposes.  In particular, the Debtors reason that the $30,039.69 of accrued interest that was added to the principal must be deducted because loan interest is a finance charge under Mass. Gen. Laws ch. 140D, § 4(a)(1) and the rescission of the underlying transaction nullifies the subsequent modification agreements.

Having determined the post-rescission loan balance, the Debtors assert that it must be treated as a general unsecured claim in their Chapter 13 plan because both Mass. Gen. Laws ch. 140D, § 10(b) and 209 C.M.R. § 32.23(4)(a) provide that when an obligor rescinds a transaction, the security interest giving rise to the right of rescission becomes void.  They contend that upon rescission the security interest is terminated as a matter of law and only the subsequent procedures described in the statute and regulations, namely, the return of any money paid by the

---

[73] *See, e.g.*, *Harris v. OSI Fin. Servs., Inc.*, 595 F.Supp.2d 885 (N.D. Ill. 2009); *Gibbons v. Interbank Funding Grp.*, 208 F.R.D. 278 (N.D. Cal. 2002); *Botelho v. Citicorp Mortg., Inc. (In re Botelho)*, 195 B.R. 558 (Bankr. D. Mass. 1996), *abrogated on other grounds by Beach v. Ocwen Fed. Bank*, 523 U.S. 410 (1998).  The Debtors also cite *Vaden v. IndyMac Bank, F.S.B.*, No. 02 C 1150, 2003 WL 22136306 (N.D. Ill. 2003), but this case is inapposite because the creditor in that case conceded it used the wrong form and attempted to rectify the situation by mailing the correct one at a later date.  Accordingly, there was no judicial determination regarding the sufficiency of the original notice.

consumer and the tender back to the creditor of the property received in the transaction, may be modified by the Court.   The Debtors argue that this is consistent with the rulings of the bankruptcy court in this district, including my prior decision in *Jaaskelainen v. Wells Fargo Bank, N.A.*[74] and Judge Boroff's decision in *Giza v. Amcap Mortgage, Inc.*[75]   They concede, however, that Judge Zobel of the United States District Court for the District of Massachusetts later held in *Wells Fargo Bank, N.A. v. Jaaskelainen* that a rescission is not complete unless and until the trial court determines whether tender is an appropriate condition of rescission.[76] Alternatively, in light of these conflicting federal decisions and the lack of any guidance from any Massachusetts court, the Debtors ask that I certify this question to the Supreme Judicial Court.

If, however, I find that tender is a condition of rescission, the Debtors assert that I should restructure the loan in a manner that would enable them to retain their home and provide Countrywide with a reasonable return on the post-rescission loan balance.   They suggest that such a restructured loan would have a fixed rate not to exceed the current market rate of 4.5% with the balance due on the original maturity date of the note, January 1, 2036, but amortized over 40 years to provide them with an affordable monthly payment.   While these terms could result in a substantial balance remaining at the end of the term, the Debtors explain that it could be satisfied by either a sale or refinance of the property.

---

[74] *Jaaskelainen v. Wells Fargo Bank, N.A. (In re Jaaskelainen)*, 391 B.R. 627 (Bankr. D. Mass. 2008), *aff'd in part, vacated in part*, *Wells Fargo Bank, N.A. v. Jaaskelainen*, 407 B.R. 449 (D. Mass. 2009) (finding the bankruptcy court has authority to condition rescission on the debtors' ability to tender).

[75] *Giza v. Amcap Mortg., Inc. (In re Giza)*, 428 B.R. 266 (Bankr. D. Mass. 2010).

[76] *Wells Fargo Bank, N.A. v. Jaaskelainen*, 407 B.R. at 459.

Finally, the Debtors request that I award them each $2,000 as statutory damages against the Defendants, jointly and severally, in light of their refusal to honor the Debtors' rescission, in addition to their actual costs and reasonable attorney's fees.

The Defendants

The Defendants assert that a presumption of delivery of four copies of the NORC arose simply because the Debtors signed the Acknowledgment. With this presumption in place, the Defendants argue that they are entitled to judgment because the Debtors have not rebutted it. Relying on *Gaona v. Town & Country Credit*,[77] the Defendants assert that a bare allegation that the notices are now not contained in the closing folder, without more, is insufficient to rebut the presumption of delivery. Moreover, the Debtors' testimony, which the Defendants contend was self-serving and incredible, could only establish that they were unsure of how many copies of the NORC they received. Indeed, because the folder was not bound or secured in any way, the Debtors could not rule out that the missing copies had fallen out or been misplaced, or that one of their children or Durant Cromwell, who all had access to the file cabinet, had moved or misplaced the additional copies. Furthermore, the Defendants assert that the testimony of Attorneys Blumenthal and Darman provide no support for the Debtors' case as they both lacked credibility. They cite Attorney Blumenthal's inconsistent testimony regarding whether the closing folder was bound in any way, Attorney Blumenthal's and Attorney Darman's conflicting accounts of whether he specifically instructed her to review the closing documents with a focus on the number of copies of the NORC, and their failure to photocopy the closing folder as examples.

---

[77] *Gaona v. Town & Country Credit*, No. 01-44-PAM/RLE, 2001 WL 1640100 (D. Minn. Nov. 20, 2001), *rev'd in part, aff'd in part*, 324 F.3d 1050 (8th Cir. 2003).

The Defendants assert that, in contrast to the Debtors' self-serving and incredible testimony, Attorney Bennett's testimony provides compelling evidence that the Debtors did, in fact, receive four copies of the NORC.  At trial, she testified that she always provides two copies of the NORC to each borrower and reviews the borrowers' packet of closing documents in advance to ensure that it contains the correct number.  Moreover, the Defendants note that Countrywide's closing instructions, which Attorney Bennett testified that she followed, not only obligated her to do so, but imposed liability against her for losses resulting from her noncompliance.

Even if the Debtors only received a single copy of the NORC, the Defendants argue that it is only a technical error that does not give rise to an extended right to rescind.  Relying on *King v. Long Beach Mortg. Co.*,[78] *Ferreira v. Mortg. Elec. Registration Sys., Inc.*,[79] *McKenna v. Wells Fargo Bank, N.A.*,[80] and *McDermott v. Mortg. Elec. Registration Sys., Inc.*,[81] the Defendants assert that there is no reason to provide an extended opportunity to rescind a transaction to a person who actually knows of the right and does not timely exercise it.  They contend that this is consistent with the United States Court of Appeals for the First Circuit's view that Congress did not intend lenders to face overwhelming liability for a relatively minor violation.

---

[78] *King v. Long Beach Mortg. Co.*, 672 F.Supp.2d at 238.

[79] *Ferreira v. Mortg. Elec. Registration Sys., Inc.*, 2011 WL 1842864 at *5.

[80] *McKenna v. Wells Fargo Bank, N.A.*, 2011 WL 1100160 at *2.

[81] *McDermott v. Mortg. Elec. Registration Sys., Inc.*, 2010 WL 3895460 at *7.

The Defendants also assert they are entitled to judgment because the Debtors' right to rescind was clearly and conspicuously disclosed.[82]  Although the form of the NORC used in this case was for a same lender refinancing transaction, the Defendants, citing *Santos-Rodriguez v. Doral Mortg. Corp.*,[83] state that this is not a per se violation of the CCCDA.  They argue that the effect of rescission is nonetheless accurately described because the form conspicuously informed the Debtors of: "(1) the retention or acquisition of a security interest on [the Debtors'] principal dwelling, (2) [the Debtors'] right to rescind, (3) an explanation of how to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business, (4) the effects of rescission, and (5) the date the rescission period expires."[84]  With respect to the effects of rescission, the Defendants assert that the language of the NORC that states "if you cancel this new transaction, it will not affect any amount that you presently owe. . . . after we receive your notice of cancellation of this new transaction, we must take the steps necessary to reflect the fact that your home does not secure the increase of credit,"[85] is accurate in this transaction because "[t]he Countrywide Loan did increase the amount of credit [the Debtors] previously owed on their prior mortgage loan, and, if Plaintiffs had canceled the Countrywide Loan, the mortgage on their home securing the prior mortgage loan would remain in place."[86]

---

[82] In their memoranda filed both prior to and after trial, the Defendants rely, in part, on the Debtors' receipt of a document entitled "Warning Regarding Notice of Right to Cancel," which is effectively an annotated version of the model rescission form applicable to a refinancing transaction with a lender other than the original lender.  *See* Defendants' Ex. 5.  At trial, however, Attorney Bennett testified that this document is intended for the closing attorney and is not typically given to the borrowers in their closing packet.  Trans. May 17, 2011 at 172:23-25; 173:1-8.  As there is no evidence that the Debtors actually received this document, and the Defendants' own witness appears to refute such a claim, I need not consider this argument further.

[83] *Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d 12 (1st Cir. 2007).

[84] Defendants' Trial Memorandum, Docket No. 146 at 10.

[85] Defendants' Ex. 1; Plaintiff's Ex. A.

[86] Defendants' Trial Memorandum, Docket No. 146 at 10.

Alternatively, the Defendants assert they are entitled to judgment on both counts of the Complaint because the borrowers were aware of and understood their right to rescind.  They rely on *Mechs. Nat'l Bank of Worcester v. Killeen*,[87] for the proposition that a rescission notice that does not comply with the CCCDA does not give rise to a claim for damages or rescission where the borrowers were not confused by it.  Accordingly, the Defendants contend that a lender's liability for providing a technically improper rescission notice depends on the borrower's subjective awareness.  Here, Mary Cromwell testified that she was not only aware of her right to rescind, but actually considered exercising it.

Finally, if I do find that the Debtors are entitled to rescind the Countrywide refinancing transaction, the Defendants argue that I not only may, but should condition rescission on the Debtors tendering back the loan proceeds to Countrywide, citing *Wells Fargo Bank, N.A. v. Jaaskelainen*.[88]  First, they assert that any alleged violation was a minor, technical violation and should not expose them to a disproportionate punishment.  Next, they note that the Debtors have enjoyed the benefits of the loan for years, having paid off several personal debts in addition to retaining their home.  Indeed, the Defendants argue that it would be wholly unfair for the Debtors to obtain a free house when the Debtors were not actually confused by the NORC.  This is particularly the case, they contend, where Countrywide entered into two loan modification agreements with the Debtors in order to help them retain their home.  In sum, the Defendants assert that not modifying the Debtors' rescission would result in them obtaining the entire benefit of the credit transaction while Countrywide would receive nothing in return.

---

[87] *Mechs. Nat'l Bank of Worcester v. Killeen*, 377 Mass. 100, 111-112 (1979).

[88] Wells Fargo Bank, N.A. v. Jaaskelainen, 407 B.R. at 460.

## IV. <u>DISCUSSION</u>

### A. <u>Introduction to TILA and the CCCDA</u>

"Both TILA and CCCDA were enacted 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.'"[89]  Additionally, "[b]oth acts provide that a borrower whose loan is secured by his principal dwelling and who has been denied the requisite disclosures may rescind the loan transaction."[90]  For this reason, the CCCDA is sometimes referred to as the Massachusetts Truth in Lending Act.[91]  In Massachusetts, however, credit transactions subject to the CCCDA are exempt from many of the provisions of TILA.[92]  Nevertheless, because the provisions of the two statutes are substantially the same in most respects, TILA remains relevant to this inquiry and federal court decisions with respect to TILA are instructive in construing the parallel provisions of the CCCDA.[93]

---

[89] *Fidler v. Cent. Coop. Bank (In re Fidler)*, 226 B.R. 734, 736 (Bankr. D. Mass. 1998) (*quoting Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998)).

[90] *Id.  See* 15 U.S.C. § 1635; Mass. Gen. Laws ch. 140D, § 10.

[91] *In re Jaaskelainen*, 391 B.R. at 636.

[92] The Federal Reserve Board has exempted credit transactions within Massachusetts subject to the CCCDA from chapters two and four of TILA. 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. § 226.29(a) ¶ 4; *see Laudani v. Tribeca Lending Corp. (In re Laudani)*, 401 B.R. 9, 25 n.13 (Bankr. D. Mass. 2009).  Chapter two of TILA includes sections 1631 through 1646.  The displacement of federal law is not absolute, however, and it is well established that borrowers retain at least the ability to file suits in federal court pursuant to 15 U.S.C. § 1640.  *Belini v. Washington Mut. Bank, FA,* 412 F.3d 17, 20 (1st Cir. 2005).

[93] *Fuller v. Deutsche Bank Nat'l Trust Co. (In re Fuller)*, 642 F.3d 240, 243 (1st Cir. 2011); *Mayo v. Key Fin. Servs., Inc.*, 424 Mass. 862, 864 (1997).  *See also* 209 C.M.R. § 32.27 (compliance with the Federal Reserve Board's Official Staff Commentary, which does not conflict with Mass. Gen. Laws ch. 140D or 209 C.M.R. 32.00 or an advisory opinion of the Commissioner, shall be deemed in compliance with the CCCDA); 209 C.M.R. § 32.28 (incorporating appendices D, E, F, G, H, and J of Regulation Z by reference).

B.  The Statutory and Regulatory Scheme

From the outset I note that because the refinancing transaction in question took place on December 23, 2005, my inquiry must focus on the text of the statute and its enabling regulations as they existed at that time.  Section 10(a) of the CCCDA provides in relevant part:

> Except as otherwise provided in this section, in the case of any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required by this chapter, whichever is later, by notifying the creditor, in accordance with regulations of the commissioner, of his intention to do so.[94]

This subsection further requires the creditor to "clearly and conspicuously disclose . . . to any obligor in a transaction subject to this section the rights of the obligor under this section" and "provide . . . appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section," "in accordance with the regulations of the commissioner."[95]  To that end, the corresponding regulation titled "Notice of Right to Rescind" provides that:

> In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:
> 1. The retention or acquisition of a security interest in the consumer's principal dwelling.
> 2. The consumer's right to rescind the transaction.
> 3. How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.
> 4. The effects of rescission, as described in 209 CMR 32.23(4).
> 5. The date the rescission period expires.[96]

---

[94] Mass. Gen. Laws ch. 140D, § 10(a) (2005).

[95] Mass. Gen. Laws ch. 140D, § 10(a) (2005).

[96] 209 C.M.R. § 32.23(2)(a) (2005).

The reference to the effects of rescission described in 209 C.M.R. § 32.23(4) largely repeats the rescission process set forth in Mass. Gen. Laws ch. 140D, § 10(b).[97]  It provides:

> (a) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.
>
> (b) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.
>
> (c) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under 209 CMR 32.23(4)(b). When the creditor has complied with 209 CMR 32.23(4)(b), the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.
>
> (d) The procedures outlined in 209 CMR 32.23(4)(b) and (c) may be modified by court order.[98]

The primary difference between this regulation and the statute is that 209 C.M.R. § 32.23(4) suggests by exclusion that the voiding of the security interest in subsection 209 C.M.R. §

---

[97] Mass. Gen Laws ch. 140D, § 10(b) provides in relevant part:

> When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within twenty days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impractical or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within twenty days after tender by the obligor, ownership of the property rests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

Mass. Gen. Laws ch. 140D, § 10(b) (2005).

[98] 209 C.M.R. § 32.23(4) (2005).

32.23(4)(a) is not one of "[t]he procedures prescribed by this subsection" that may be modified by the Court.[99]

To satisfy these disclosure requirements, the regulations mandate that "the creditor shall provide a notice that conforms with the model forms in Appendix H of Regulation Z, as appropriate, or a substantially similar notice."[100]  Appendix H contains two model forms: H-8 – Rescission Model Form (General) ("Form H-8"), and H-9 – Rescission Model Form (Refinancing With Original Creditor) ("Form H-9").[101]  Because the right to rescind does not apply to a same creditor refinancing to the extent of the existing debt,[102] Form H-9 discloses that in such a transaction, the right to rescind only applies to the new amount financed that exceeds the principal balance plus any earned unpaid finance charges.[103]  In other words, when a consumer refinances an existing mortgage with its current lender, it may only rescind that new transaction, i.e., the amount advanced in the new transaction.  Specifically, the form provides, in relevant part, that:

> You are entering into a new transaction to increase the amount of credit previously provided to you. Your home is the security for this new transaction. You have a legal right under federal law to cancel this new transaction, without cost, within three business days from whichever of the following events occurs last:
>
> * * *
>
> If you cancel this new transaction, it will not affect any amount that you presently owe. Your home is the security for that amount. Within 20 calendar days after we receive your notice of cancellation of this new transaction, we must take the steps

---

[99]Mass. Gen. Laws ch. 140D, § 10(b) (2005).

[100] 209 C.M.R. § 32.23(2)(b) (2005).

[101] 12 C.F.R. Pt. 226, App. H (2005).

[102] *See* Mass. Gen. Laws ch. 140D, § 10(e)(1)(B) (2005); 209 C.M.R. § 32.23(6)(b) (2005).

[103] 12 C.F.R. Pt. 226, App. H-9 (2005).

necessary to reflect the fact that your home does not secure the increase of credit. We must also return any money you have given to us or anyone else in connection with this new transaction.

You may keep any money we have given you in this new transaction until we have done the things mentioned above, but you must then offer to return the money at the address below.

If we do not take possession of the money within 20 calendar days of your offer, you may keep it without further obligation.[104]

In contrast, Form H-8, which generally applies to all transactions subject to the right to rescind,

provides in relevant part:

You are entering into a transaction that will result in a [mortgage/lien/security interest] [on/in] your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

* * *

If you cancel the transaction, the [mortgage/lien/security interest] is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the [mortgage/lien/security interest] [on/in] your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.[105]

If the creditor provides "the obligor the appropriate form of written notice published and

adopted by the commissioner, or a comparable written notice of the rights of the obligor," the

right to rescind cannot arise solely from the form of written notice used to disclose those

---

[104] *Id.*

[105] 12 C.F.R. Pt. 226, App. H-8 (2005).

rights.[106]  Indeed, if the creditor uses the appropriate model form, the creditor will be deemed in compliance with the disclosure requirements of the CCCDA so long as the creditor does not change the form in a way that affects the clarity, substance, or meaningful sequence of the disclosure.[107]  Additionally, the creditor may require the borrower to sign an acknowledgment of receipt of the required number of copies of the NORC, which may be included in the NORC itself, but such an acknowledgment "does no more than create a rebuttable presumption of delivery thereof."[108]

As quoted above, the CCCDA generally provides that the obligor has three business days to exercise the right to rescind starting from either the consummation of the transaction or the delivery of the material disclosures and rescission forms, whichever is later.[109]  Notwithstanding the non-delivery of these disclosures and forms, the right to rescind expires, subject to certain exceptions not relevant here, four years from the date of consummation.[110]  Notably, the effects of rescission as described in 209 C.M.R. § 32.23(4) do not fall within the definition of "material disclosures" under the CCCDA, but are included the definition of "material disclosures" in the applicable regulation.[111]  This, however, is likely a distinction without a difference because Mass. Gen. Laws ch. 140D, § 10(a) still requires "the delivery of the . . . rescission forms,"

---

[106] Mass. Gen. Laws ch. 140D, § 10(h) (2005).

[107] Mass. Gen. Laws ch. 140D, § 18 (2005).

[108] Mass. Gen. Laws ch. 140D, § 10(c) (2005).

[109] Mass. Gen. Laws ch. 140D, § 10(a) (2005).

[110] Mass. Gen. Laws ch. 140D, § 10(f) (2005); 209 C.M.R. § 32.23(1)(c) (2005).

[111] *Cf.* Mass. Gen. Laws ch. 140D, § 1 (2005) *with* 209 C.M.R. § 32.23(1)(c) fn. 48 (2005).

whose content is expressly set forth by the regulations, in order to trigger the three business days period in which the right to rescind may be exercised.[112]

In addition to rescission, if a court determines that a creditor has violated Mass. Gen. Laws ch. 140D, § 10, it may award relief under Mass. Gen. Laws ch. 140D, § 32.  That section provides in relevant part:

> Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this chapter or any rule or regulation issued thereunder including any requirement under section ten with respect to any person is liable to such person in an amount equal to the sum of:
> (1) Any actual damage sustained by such person as a result of the failure;
> (2) . . . or (c) in the case of an individual action relating to a credit transaction not under an open-end credit plan that is secured by real property or a dwelling, not less than two hundred dollars or greater than two thousand dollars; and
> (3) In the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section ten, the costs of the action, together with a reasonable attorney's fee as determined by the court.[113]

The statutory "damages under clause (2) of subsection (a)" are limited to a single recovery even when there are multiple obligors in a single consumer credit transaction.[114]

## C.  The Standard of Clear and Conspicuous Disclosure

The Supreme Court of the United States has observed that "[m]eaningful disclosure does not mean more disclosure.  Rather, it describes a balance between competing considerations of complete disclosure . . . and the need to avoid . . . [informational overload]."[115]  With this in mind, "[m]ost courts have concluded that the TILA's clear and conspicuous standard is less

---

[112] Mass. Gen. Laws ch. 140D, § 10(a) (2005).

[113] Mass. Gen. Laws ch. 140D, § 32(a) (2005).

[114] Mass. Gen. Laws ch. 140D, § 32(d) (2005).

[115] *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980).

demanding than a requirement of perfect notice."[116]  Accordingly, the First Circuit has rejected a

rule of hyper-technicality with respect to TILA violations in favor of an objective standard of

clear and conspicuous disclosure:[117]

> This emphasis on objective reasonableness, rather than subjective understanding,
> is also appropriate in light of the sound tenet that courts must evaluate the
> adequacy of TILA disclosures from the vantage point of a hypothetical average
> consumer-a consumer who is neither particularly sophisticated nor particularly
> dense.[118]

"The average consumer test . . . provides a higher tolerance level for non-confusing mistakes in

disclosures to consumers . . . ."[119]  In adopting this standard, the First Circuit reasoned that by

amending TILA in 1995 to provide higher tolerance levels for "honest mistakes in carrying out

disclosure obligations . . . Congress made manifest that although it had designed the TILA to

protect consumers, it had not intended that lenders would be made to face overwhelming liability

for relatively minor violations."[120]  While the objective standard is forgiving of less than perfect

---

[116] *Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d at 16.  *See, e.g.*, *Palmer v. Champion Mortg.*, 465 F.3d 24, 27
(1st Cir. 2006) (adopting a standard of objective reasonableness for determining whether a notice is clear and
conspicuous under TILA); *Veale v. Citibank*, 85 F.3d 577, 581 (11th Cir. 1996) ("TILA does not require perfect
notice; rather it requires a clear and conspicuous notice of rescission rights."); *Smith v. Chapman*, 614 F.2d 968, 972
(5th Cir. 1980) ("Strict compliance does not necessarily mean punctilious compliance if, with minor deviations from
the language described in the Act, there is still a substantial, clear disclosure of the fact or information demanded by
the applicable statute or regulation."); *Dixon v. D.H. Holmes Co.*, 566 F.2d 571, 573 (5th Cir. 1978) ("The question
is not whether [notice provided under the TILA] is capable of semantic improvement but whether it contains a
substantial and accurate disclosure . . . .").

[117] *See Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d at 17 n.6; *McKenna v. First Horizon Home Loan*, 475
F.3d 418, 424 (1st Cir. 2007).

[118] *Palmer v. Champion Mortg.*, 465 F.3d at 28 (*citing Smith v. Cash Store Mgmt., Inc.*, 195 F.3d 325, 327-28 (7th
Cir.1999) and *Edmondson v. Allen-Russell Ford, Inc.*, 577 F.2d 291, 296 (5th Cir.1978)).

[119] *King v. Long Beach Mortg. Co.*, 672 F.Supp.2d at 249.

[120] *McKenna v. First Horizon Home Loan*, 475 F.3d at 424.

compliance with every single disclosure requirement set forth in the regulations, "a misleading disclosure is as much a violation of TILA as a failure to disclose at all."[121]

Despite this well-established precedent, the Defendants, relying on *Mechs. Nat'l Bank of Worcester v. Killeen*, assert that the standard under Massachusetts law is ultimately a subjective one. *Killeen* involved an alleged violation of Mass. Gen. Laws ch. 140C, § 8(b), the predecessor of Mass. Gen. Laws ch. 140D, § 10(a).[122]  That section provided that the lender must notify the borrower of his right to cancel the transaction by furnishing two copies of a statutory form that required, *inter alia*, the lender to disclose its name by filling in the appropriate blank.[123]  In that case, the lender provided the borrower with two copies of the notice, but its name only appeared on one of the two copies.[124]  The Supreme Judicial Court found no violation of Mass. Gen. Laws ch. 140C, § 8(b), concluding that the name of the lender was disclosed pursuant to the statute because it appeared on the other copy of the notice.[125]

The Defendants erroneously conclude that *Killeen* was decided under a subjective standard because the Supreme Judicial Court found that "[t]he Killeens knew who the lender was, and they did not undertake seasonably to rescind the transaction, as the bank's notice

---

[121] *Barnes v. Fleet Nat'l Bank*, 370 F.3d 164, 174 (1st Cir. 2004) (*quoting Smith v. Chapman*, 614 F.2d at 977)). *See Palmer v. Champion Mortg.*, 465 F.3d at 27.

[122] *Mechs. Nat'l Bank of Worcester v. Killeen*, 377 Mass. at 111.

[123] Mass. Gen. Laws ch. 140C, § 8(b) (1974) ("Whenever a customer has the right to rescind a transaction under subsection (a), the creditor shall notify him of that fact by furnishing him with two copies of the notice set out below . . . Before furnishing the copies of the notice to the customer, the creditor shall complete both copies with the name of the creditor . . . ").

[124] *Mechs. Nat'l Bank of Worcester v. Killeen*, 377 Mass. at 111-112 ("One of the two statutory forms of notice required by G.L. c. 140C, § 8(B) [sic], as to a mortgage on a borrower's principal residence, did not have the bank's name on it. Although handwriting recorded through carbon paper onto all copies of the form, a stamp with the bank's name on it did not.").

[125] *Id.* at 112.

advised them they could."[126]  This is because they failed to read the sentences that immediately

follow that passage:

> Section 10(B) [sic] of G.L. c. 140C provides penalties for failure to disclose any
> information required under G.L. c. 140C. Here *the name of the lender was
> disclosed*, and thus relief under G.L. c. 140c [sic], § 10(B) [sic], is not
> available.[127]

Although this case substantially predates the First Circuit's adoption of the objective standard, I

note that it is completely consistent with such an analysis because the Supreme Judicial Court

concluded that the right to rescind was adequately disclosed even though one of the copies of the

notice suffered from a minor defect.[128]   Accordingly, I find that a subjective standard is

inapplicable to the question of whether the right to rescind was adequately disclosed.

### D.   Count I – Adequacy of Delivery of the NORC

As it is undisputed that the Debtors received at least one copy of the NORC, I must

consider the threshold issue of whether receipt of a single copy of the NORC triggers an

extended right to rescind under the CCCDA.   In *Jaaskelainen*, I previously answered this

question in the affirmative and was affirmed by Judge Zobel on this issue.[129]  Subsequently,

Judge Young of the United States District Court for the District of Massachusetts has answered

---

[126] *Id.* at 111-112.

[127] *Id.* at 112 (emphasis added).

[128] *Cf. Mechs. Nat'l Bank of Worcester v. Killeen*, 377 Mass. at 112 (finding that the right to rescind was adequately disclosed even though the lender's name did not appear on one of the statutory notices) *with Melfi v. WMC Mortg. Corp.*, 568 F.3d 309, 312-313 (1st Cir. 2009) (holding that a NORC was not defective or confusing because the lender did not complete the blank stating the rescission deadline because the form nonetheless provided all the information needed to determine that date); *Palmer v. Champion Mortg.*, 465 F.3d at 28-29 (holding that a NORC that contained an rescission deadline that expired prior to the borrower having received the NORC was not defective or confusing because it expressly provided alternative deadlines in such an event).

[129] *In re Jaaskelainen*, 391 B.R. at 644, *aff'd in part, vacated in part*, *Wells Fargo Bank, N.A. v. Jaaskelainen*, 407 B.R. at 456-457.

this question in the negative and several other United States District Court judges for this district have adopted his reasoning.

In *King v. Long Beach Mortg. Co.*, Judge Young examined the analogous provisions of Regulation Z and reasoned that:

> Under 12 C.F.R. § 226.23(b)(1) [or 209 C.M.R. § 32.23(2)(a)], "a creditor shall deliver two copies of the notice of the right to rescind to each consumer . . . ." Even so, the rescission right is extended to three years only "if the required notice or material disclosures are not delivered." 12 C.F.R. § 226.23(a)(3) [or 209 C.M.R. § 32.23(1)(c)] (emphasis added). Significantly, the word "notice" appears in the singular. Elsewhere in Regulation Z, the Federal Reserve Board has used the terms "notices" or "two copies of the notice" whenever it wished to convey that more than one notice is required. (*See e.g.* 12 C.F.R. § 226.19(b)(2)(xi) ("The type of information that will be provided in notices of adjustments and the timing of such notices.") (emphasis added)). By deliberately choosing to use the singular form "notice" instead of the plural form "notices" or "two copies of the notice," the Federal Reserve Board intended that delivery of a single copy of the Notice would not trigger an extension of the rescission right. In light of this deliberate choice of words, the default rule of construction that "[w]here appropriate, the singular form of a word includes the plural form and plural includes singular," 12 C.F.R. § 226.2(b)(1) [or 209 C.M.R. § 32.23(2)(a)], is not appropriate in this context.[130]

Judge Young concluded that Congress only intended that a derogation of the lender's duty to deliver two copies of the NORC constitute a violation of TILA for which other remedies, such as damages, may be awarded.[131]

Thereafter, Judge O'Toole adopted Judge Young's reasoning, explaining:

> By acknowledging that he received at least one copy of the notice, McDermott admits that he had actual notice of the right to cancel or rescind the transaction. I agree with the recent decision by my colleague Judge Young that the delivery of only a single copy of the notice rather than two would not trigger an extension of the period within which the right to rescind could be exercised. *See King v. Long Beach Mortg., Co.*, 672 F.Supp.2d 238, 250–51 (D. Mass. 2009). Not only is that interpretation consistent with the language of the applicable regulation, *see id.* at

---

[130] *King v. Long Beach Mortg. Co.*, 672 F.Supp.2d at 250-251 (parallel citations to the Massachusetts Code of Regulations added).

[131] *Id.* at 251.

250, it also is consistent with the sense and purpose of the regulation. It makes sense to provide for an extended period within which a person ignorant—because not informed—of the right to rescind might discover the existence of the right and choose to exercise it. There is no reason to provide such an extended opportunity to a person who actually knows of the existence of the right to cancel and does not timely exercise it.[132]

Judges Gorton and Tauro have since followed *King* without further discussion.[133]

Having reviewed *King* thoroughly, I must respectfully disagree with Judge Young's conclusion. Notwithstanding the fact that the regulations provide that "[t]he consumer may exercise the right to rescind until midnight of the third business day following . . . delivery of the *notice* required by 209 CMR 32.23(1)(b),"[134] the statute uses the plural: "the obligor shall have the right to rescind the transaction until midnight of the third business day following . . . the delivery of the information and *rescission forms* required under this section . . . ."[135] As that section does not require any other "information" form[136] and must be delivered "together with a statement containing the material disclosures," that passage can only mean that failure to deliver the requisite number of "*rescission forms*" must give rise to an extended right to cancel.[137]

Having determined that the number of copies of the NORC the Debtors received is relevant to their claim for rescission, I must next consider the effect of the Acknowledgment in

---

[132] *McDermott v. Mortg. Elec. Registration Sys., Inc.*, 2010 WL3895460 at *7.

[133] *Ferreira v. Mortg. Elec. Registration Sys., Inc.*, 2011 WL 1842864 at *5; *McKenna v. Wells Fargo Bank, N.A.*, 2011 WL 1100160 at *2 n. 33.

[134] 209 C.M.R. § 32.23(1)(c) (2005) (emphasis added).

[135] Mass. Gen. Laws ch. 140D, § 10(a) (2005) (emphasis added). Although this decision references the text of the CCCDA as it existed in 2005, the current versions of both Mass. Gen. Laws ch. 140D, § 10(a) and 15 U.S.C. § 1635(a) contain identical language.

[136] The reference to the "information . . . required under this section" must refer to the content of the rescission forms.

[137] Mass. Gen. Laws ch. 140D, § 10(a) (2005) (emphasis added). I further note that even if *King* is correct, it is nonetheless inapposite because this case involved two consumers with only one copy of the NORC between them.

34

this case.  As explained above, any signed acknowledgment of receipt of the requisite number of copies of the NORC "does no more than create a rebuttable presumption of delivery thereof."[138] Here, it is undisputed that the Debtors signed the following Acknowledgment: "[t]he undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement."[139]  Nonetheless, they argue that defects in the delivery procedure and Acknowledgment language prevent a presumption of adequate delivery from arising in this case.

First, the Debtors argue that no presumption can arise because Attorney Bennett testified that she had not given the Debtors their folder of closing documents at the time they signed the Acknowledgment.  This argument is premised on the faulty assumption that delivery triggers the presumption.  To the contrary, the act of signing the Acknowledgment itself creates the presumption.  This act is wholly independent of the issue of when or whether the Debtors received the copies of the NORC.  Ultimately, the circumstances surrounding the delivery of the copies of the NORC and signing of an acknowledgment are only relevant to rebutting the presumption once it arises.

Because the Debtor's signature on the Acknowledgment created a presumption, the next question is what the nature of that presumption was.  The Debtors contend that "the acknowledgement . . . contains the printed names of *both* borrowers and signature lines for *both* borrowers, so the "two copies" referenced can only reasonably mean the *same* two copies with respect to each borrower, for a *total* of two."[140]  In contrast, the Defendants argue that "the

---

[138] Mass. Gen. Laws ch. 140D, § 10(c) (2005).

[139] Defendants' Ex. 1; Plaintiff's Ex. A.

[140] Plaintiffs' Post-Trial Memorandum of Law, Docket No. 159 at 5 (emphasis in original).

language makes clear . . . [that the] Plaintiffs acknowledged that they each received two copies . . . ."[141] Ultimately, I disagree with both parties as I find that the phrase "[t]he undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL," is ambiguous.[142] The placement of the word "each" before "acknowledge" renders the phrase susceptible to two meanings. First, that the Debtors acknowledged each received two copies as the Defendants' assert, or second, that they each acknowledged receipt of a total of two copies as the Debtors suggest.[143] While I understand that Countrywide intended the former as that is what the law required, the average consumer would not have necessarily known that.[144] Accordingly, I find that the ambiguity must be resolved against the drafter of the Acknowledgment such that it did not create a presumption of adequate delivery of a total of four copies of the NORC in this case.[145]

Without a presumption of adequate delivery in place, it was the Defendants' burden to prove that the Debtors each received two copies of the NORC. To meet that burden, the Defendants offered the testimony of Attorney Bennett, who testified that she had no recollection of this closing, but that her usual practice was to always make sure the closing packets had the

---

[141] Defendants' Trial Memorandum, Docket No. 146 at 5.

[142] *Id.*

[143] *See Smith v. Argent Mortg. Co.*, 331 Fed.Appx. 549, 557 n. 6, 2009 WL 1391550 (10th Cir. 2009) (Not applying a presumption of delivery where the court found that "language on the Notice stating that 'the undersigned each acknowledge receipt of two copies of the Notice of Right to Cancel' could reasonably be understood to mean either that Mr. and Mrs. Smith acknowledged having received two copies apiece, for a total of four copies, or that Mr. and Mrs. Smith acknowledged having received two total copies.").

[144] The knife cuts both ways, as Attorney Bennett's testimony cannot bolster the presumption, just as the Debtors' testimony could not keep it from arising.

[145] *See, e.g., LFC Lessors, Inc. v. Pac. Sewer Maint. Corp.*, 739 F.2d 4, 7 (1st Cir. 1984) ("an ambiguous contract should be construed against the drafting party"); *Chelsea Indus., Inc. v. Accuray Leasing Corp.*, 699 F.2d 58, 61 (1st Cir. 1983) ("[I]n case of doubt, an instrument is to be taken against the party that drew it"); *ER Holdings, Inc. v. Norton Co.*, 735 F.Supp. 1094, 1100 (D. Mass. 1990) ("Massachusetts law construes ambiguous contractual language against the drafter").

correct number of copies of the NORC before giving it to the borrowers. While I generally found Attorney Bennett to be credible, the problem with "usual practice" evidence is that it does not apply to unusual circumstances.[146] Here, the evidence presented by the Debtors refutes the idea that this case followed the usual practice.

In particular, I find it significant that the folder of closing documents had only a single copy of the NORC at the time Attorneys Blumenthal and Darman reviewed it in January, 2009. The Defendants' suggest that I should not credit either of those witnesses because they gave inconsistent accounts of some details of their meeting with the Debtors.[147] Given that Attorney Bennett does not specifically recall this closing, one would think the Defendants would be more understanding. In any event, there is only one piece of information that either of them testified to that is of any relevance here; namely, that they each found only a single copy of the NORC in the folder. As this fact dictated all subsequent actions, including immediately referring the Debtors to Attorney Quat who specializes in CCCDA cases, I find that Attorney Blumenthal and Attorney Darman testified credibly in this regard. Indeed, finding that their testimony was incredible would require me to find that they were lying at trial and removed copies of the NORC themselves. The record simply contains no facts to support such a bold accusation of misconduct on the part of two attorneys in good standing.[148]

---

[146] When a person testifies that they "always" do something, they at best mean that they act in conformance with that procedure until something out of the ordinary causes them to deviate from it.

[147] *See* footnotes 65-66, *supra*.

[148] To reiterate, the Defendants assert that their testimony should be disregarded because Attorney Blumenthal could not recall at trial whether the closing folder was bound in any way even though he testified that it was not at a prior deposition and because he and Attorney Darman gave conflicting accounts as to whether he specifically instructed her to review the closing documents with a focus on the number of copies of the NORC. These are small details compared to whether or not they found more than one NORC. The Defendants also believe that it is significant that Attorney Blumenthal did not photocopy the folder of closing documents to prove that it contained only a single copy of the NORC. Putting aside the epistemological quandary involved in photocopying the absence of a document from a folder, having been down this road in *Jaaskelainen*, I know from experience that the Defendants would then have challenged the completeness of the photocopy in addition to questioning the attorney's veracity.

Up to the point of that meeting, I find that the Debtors testified credibly that they never looked in the folder and placed it in a file cabinet drawer immediately after the closing, where it remained undisturbed.  Although other people had access to the file cabinet, the Debtors credibly testified that neither Douglas's mentally impaired uncle, nor their children, did, in fact, access the folder.  The Defendants, who bore the burden to prove adequate delivery, have not refuted that testimony simply by suggesting that it is self-serving or that someone else could have removed the copies of the NORC.[149]  Therefore, I find that the Defendants' did not prove that the Debtors received a total of four copies of the NORC.

### E.   Count II – Adequacy of Disclosure of the NORC

As explained above, the NORC must clearly and conspicuously disclose, *inter alia*, the effects of rescission, as described in 209 C.M.R. § 32.23(4),[150] which are:

> (a) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.
> (b) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.
> (c) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under 209 CMR 32.23(4)(b). When the creditor has complied with 209 CMR 32.23(4)(b), the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated

---

[149] It is also worth noting that the Defendants' reliance on *Gaona v. Town & Country Credit*, 2001 WL 1640100 at *1, is misplaced for several reasons.  In that case, the court concluded that an incomplete folder, absent more compelling evidence, could not rebut the presumption of adequate delivery because, at best, the debtors could only testify that they were unsure how many copies of the NORC they received.  *Id.* at *3.  Because there is no presumption of adequate delivery in this case and the burden was on the Defendants from the start, *Gaona* is inapposite.  Moreover, other courts have suggested that the *Gaona* court applied too high a standard by seeking more compelling evidence.  *See Davison v. Bank One Home Loan Servs.*, No. 01-2511-KHV, 2003 WL 124542 *4 n. 9 (D. Kan. Jan. 13, 2003); *Jones v. Novastar Mortg., Inc. (In re Jones)*, 298 B.R. 451, 459 (Bankr. D. Kan. 2003).

[150] 209 C.M.R. § 32.23(2)(a) (2005).

> place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.
>
> (d) The procedures outlined in 209 CMR 32.23(4)(b) and (c) may be modified by court order.[151]

To satisfy these disclosure requirements, a "creditor shall provide a notice that conforms with the model forms in Appendix H of Regulation Z, as appropriate, or a substantially similar notice,"[152] indicating that a creditor's failure to use the appropriate model form is not a *per se* violation of the CCCDA so long as the form used is "substantially similar."[153]  Indeed, extended rescission rights do not arise from "a comparable written notice of the rights of the obligor . . . [that] otherwise complied with all other requirements of this section regarding notice."[154] Consequently, the adequacy of the form of NORC used ultimately hinges on whether, under an objective standard, it clearly and conspicuously informed the borrowers of their right to rescind and the effects thereof.  This means that the NORC form used must accurately, though not necessarily perfectly, describe the effects of rescission in compliance with the regulation such that an average consumer "who is neither particularly sophisticated nor particularly dense"[155] would not be confused.[156]

---

[151] 209 C.M.R. § 32.23(4) (2005).

[152] 209 C.M.R. § 32.23(2)(b) (2005).

[153] *Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d at 15.  *But see* Mass. Gen. Laws ch. 140D, § 18 (2005) (a creditor using the appropriate model form shall be deemed in compliance with the disclosure requirements of the CCCDA).

[154] Mass. Gen. Laws ch. 140D, § 10(h) (2005).

[155] *Palmer v. Champion Mortg.*, 465 F.3d at 27.

[156] *See Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d at 18; *McKenna v. First Horizon Home Loan Corp.*, 537 F.Supp.2d 284, 290-291 (D. Mass. 2008).

In the present case, it is undisputed that the form of NORC used was Form H-9, which is designed for same lender refinancing transactions.  As quoted above, the NORC described the effects of rescission as follows:

> If you cancel this new transaction, it will not affect any amount that you presently owe.  Your home is the security for that amount.  Within 20 calendar days after we receive your notice of cancellation of this new transaction, we must take the steps necessary to reflect the fact that your home does not secure the increase of credit.  We must also return any money you have given to us or anyone else in connection with this new transaction.[157]

Obviously, this was not the "*appropriate* model form" [158] for this transaction as Countrywide was not the original lender, so the fact that it is one of the model forms in Appendix H is not conclusive as to the adequacy of its disclosures.

The Debtors argue that the effects of rescission described in the NORC are grossly inaccurate because no amount would be owed to Countrywide upon rescission and the entire security interest would become void.  In contrast, the Defendants assert that the information contained in the NORC are all literally true because Countrywide did increase the amount of credit previously owed to their prior lender and, had the Debtors rescinded the loan, the prior mortgage would have remained in place.  Without question, the Debtors have the better side of this argument as accuracy, by itself, is insufficient.

The Defendants contend that Form H-9 adequately discloses the effects of rescission in every refinancing transaction, but they rely on a particularly tortured reading of the quoted language to tout the almost inadvertent technical accuracy of the NORC at the time of the

---

[157] Defendants' Ex. 1; Plaintiffs' Ex. A.

[158] Mass. Gen. Laws ch. 140D, §§ 10(h), 18 (2005) (emphasis added).

closing.[159]  Such an interpretation is at best plausible and far from clear.  Remembering that "a misleading disclosure is as much a violation of TILA as a failure to disclose at all,"[160] I find that the average consumer, who, again, "is neither particularly sophisticated nor particularly dense,"[161] would be misled to believe that the right to cancel applied only to the increase in credit and not the entire amount loaned.  There is, of course, an excellent reason for this misunderstanding-- the Federal Reserve Board specifically adopted this form to describe the effects of rescission in a transaction where the borrower's right to rescind is limited to the extension of new credit only.  Even assuming, *arguendo*, that the borrower would understand that the "amount that you presently owe" language refers to their prior loan with a different lender, Form H-9 does not reflect that the new lender's security interest is void, as is required by Mass. Gen. Laws ch. 140D, § 10(b) and 209 C.M.R. § 32.23(4)(a).  Instead, Form H-9 indicates that the borrower's "home does not secure the *increase in credit*."[162]  Keeping in mind this new transaction has an "old money" component, Form H-9 suggests, as it was meant to, that the present lender retains a security interest for the balance owed for that amount.

---

[159] Put simply, the Defendants assert that anytime a borrower rescinds a refinancing transaction, they are left owing money to someone that is secured by their home.  That, however, is not necessarily true because there are circumstances where the right to rescind might not have expired before the prior mortgage is discharged.  If, for example, the borrower did not receive the requisite number of copies of the NORC or the material disclosures until a week after the closing, a possibility expressly contemplated by the CCDA, regulations, and NORC itself, then the three business day rescission period would likely occur after the discharge of the prior mortgage.  Under those circumstances, the borrower would owe nothing and there would be no security interest remaining on the home upon rescission.  Form H-8, on the other hand, is accurate under any circumstances.  *See Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d at 18 (holding that Form H-8 accurately clearly and conspicuously discloses the effects of rescission of a same lender refinancing transaction).

[160] *Barnes v. Fleet Nat'l Bank*, 370 F.3d at 174 (*quoting Smith v. Chapman*, 614 F.2d at 977)). *See Palmer v. Champion Mortg.*, 465 F.3d at 27.

[161] *Palmer v. Champion Mortg.*, 465 F.3d at 27.

[162] Defendants' Ex. 1; Plaintiffs' Ex. A (emphasis added).

All other reported decisions, including one from this district, have reached the same conclusion, though admittedly, most hail from circuits where hyper-technicality reigns.[163] Nonetheless, this result is consistent with the average consumer standard adopted by the First Circuit.  The decision in *Santos-Rodriguez v. Doral Mortg. Corp.*,[164] though distinguishable, is informative on this issue.  In that case, the borrowers entered into a refinancing transaction with their original lender to increase the amount of credit provided, but were given Form H-8.[165] Even though the NORC failed to affirmatively inform the borrowers that they could not rescind their original transaction, the First Circuit concluded that the form's general statement that the cancellation of the transaction would also cancel the security interest clearly and conspicuously described the effects of rescinding the new transaction.[166]  While Form H-9 would have provided a more complete disclosure regarding the original transaction, Form H-8 sufficiently explained what would happen to the new loan and the new security.[167]  The present case is the opposite scenario, where the language in Form H-9 provides too much information and ultimately clouds the description of the effect of rescinding the current non-same lender refinancing transaction.

---

[163] *See Harris v. OSI Fin. Servs., Inc.*, 595 F.Supp.2d at 892; *In re Botelho*, 195 B.R. at 568.  *See also Handy v. Anchor Mortg. Corp.*, 464 F.3d 760, 764 (7th Cir. 2006) ("Even if Anchor is correct that a close parsing of Form H-9's 'effects of rescission' statement might make it possible to reconcile it with the type of loan extended to Handy, the notice provided remains insufficient for Anchor to prevail. Where more than one reading of a rescission form is 'plausible,' the form does not provide the borrower 'with a clear notice of what her right to rescind entail[s].' *Porter v. Mid-Penn Consumer Disc. Co.*, 961 F.2d 1066, 1077 (3d Cir. 1992)."); *Gibbons v. Interbank Funding Grp.*, 208 F.R.D. at 283 (finding that a form substantially similar to Form H-9 that expressly stated that the new lender would retain a security interest for the existing credit transaction did not clearly and conspicuously disclose the plaintiff's rescission rights).

[164] *Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d at 18

[165] *Id.* at 14.

[166] *Id.* at 18.

[167] *Id.*

Accordingly, regardless of the number of copies the Debtors received, I find that the NORC that they were provided did not clearly and conspicuously disclose the effects of rescission in this case.

F.   Rescission and the Condition of Tender

As has been repeatedly discussed above, "[w]hen a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void . . . ."[168]   Instead of "rescinds," the corresponding section of the CCCDA uses the phrase "exercises his right to rescind under subsection (a),"[169] indicating that "rescind[ing]" in the context of the regulation is the exercise of one's right to rescind under Mass. Gen. Laws ch. 140D, § 10(a).[170]   This interpretation is consistent with the following part of both the CCCDA and the regulation, which each provide that "[w]ithin 20 calendar days after receipt of a notice of rescission, the creditor shall . . . take any action necessary to *reflect the termination of the security interest*."[171]   The clear import of the word "reflect" is that the security interest has already terminated as a matter of law by the time the creditor must act.[172]   This, however, does not mean that a mere *assertion* of a right of rescission, by itself, voids the security interest.[173]

---

[168] 209 C.M.R. § 32.23(4)(a) (2005).

[169] Mass. Gen. Laws ch. 140D, § 10(b) (2005).

[170] *Large v. Conseco Fin. Serv. Corp.*, 292 F.3d 49, 55 (1st Cir. 2002).

[171] 209 C.M.R. § 32.23(4)(b) (2005) (emphasis added); *see* Mass. Gen. Laws ch. 140D, § 10(b) (2005).

[172] *See* 12 C.F.R. Pt. 226, Supp. I., 12 C.F.R. 226.23(d)(1) ("Termination of security interest. Any security interest giving rise to the right of rescission becomes void when the consumer exercises the right of rescission. The security interest is automatically negated regardless of its status and whether or not it was recorded or perfected. Under § 226.23(d)(2), however, the creditor must take any action necessary to reflect the fact that the security interest no longer exists.").

[173] *See Thompson v. Irwin Home Equity Corp.*, 300 F.3d 88, 90 (1st Cir. 2002); *Large v. Conseco Fin. Serv. Corp.*, 292 F.3d at 55; *Wells Fargo Bank, N.A. v. Jaaskelainen*, 407 B.R. at 458-459; *In re Giza*, 428 B.R. at 274; *accord American Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 821 (4th Cir. 2007); *Yamamoto v. Bank of New York*, 329 F.3d 1167, 1172 (9th Cir. 2003).

In *Large v. Conseco Fin. Serv. Corp.*, the First Circuit explained that:

> The natural reading of this language is that the security interest becomes void when the obligor exercises a right to rescind that is available in the particular case, either because the creditor acknowledges that the right of rescission is available, or because the appropriate decision maker has so determined. If a lender disputes a borrower's purported right to rescind, the designated decision maker . . . must decide whether the conditions for rescission have been met.[174]

Based upon the first sentence in that passage, I understand the word "conditions" in the second sentence to refer only to the statutory availability of the right to rescind as described in Mass. Gen. Laws ch. 140D, § 10(a) and 209 C.M.R. § 32.23(1)(c).[175] Put simply, where the creditor contests the borrower's pre-litigation assertion of the right to rescind, the security interest is automatically voided not upon the assertion, but upon the adjudication that the assertion was, in fact, an exercise of a legally available right without regard to any modification the court may order.[176]

This interpretation is consistent with the CCCDA and its regulations for several reasons.[177] First, the only conditions either place on a consumer's right to rescind are that the transaction must not be statutorily exempt[178] and that the right to rescind must be exercised within 3 business days following either consummation, the delivery of the notice of the right to

---

[174] *Large v. Conseco Fin. Serv. Corp.*, 292 F.3d at 54-55.

[175] *Id.* at 56 (stating that the voiding of the security "presupposes that the grounds for rescission have been established, either by agreement or by an appropriate decision maker.").

[176] *Id.* at 55 ("Rescission under TILA is 'automatic' in the sense that, in contrast to common law rescission, the borrower need not first return the loan proceeds received under the agreement to effect a rescission.").

[177] The Supreme Court has held that Regulation Z is "binding in the courts unless procedurally defective, arbitrary or capricious in substance or manifestly contrary to the statute." *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242 (2004) (citations omitted). The Massachusetts Supreme Judicial Court has also indicated that " '[w]here [an agency's] statutory interpretation is reasonable . . . the court should not supplant [the agency's] judgment.' " *DiVittorio v. HSBC Bank USA, N.A.*, 423 B.R. 391, 393 (D. Mass. 2010) (*citing Mass. Med. Soc. v. Comm'r of Ins.*, 402 Mass. 44 (1988)).

[178] *See* Mass. Gen Laws ch. 140D, §§ 10(e) (2005); 209 C.M.R. § 32.23(6) (2005).

cancel, or the delivery of the material disclosures, whichever occurs last, but not later than the fourth anniversary of consummation.[179]    Second, the voiding of the security interest is not conditioned on the performance of the parties' reciprocal obligations.[180]    To the contrary, the creditor's obligation is to reflect that the security interest has already terminated, and the consumer's obligation to tender is not triggered until the creditor has fully performed.[181]    Third, in view of the maxim *expressio unius est exclusio alterius*, "which translates roughly as 'the expression of one thing is the exclusion of other things'" and is "a venerable canon of statutory construction,"[182] I must find that because 209 C.M.R. § 32.23(4)(d) states that "[t]he procedures outlined in 209 CMR 32.23(4)(b) and (c) may be modified by court order,"[183] the voiding of the security interest as described in 209 C.M.R. § 32.23(4)(a) is not a "procedure" and cannot be modified by the court.[184]

When and in what order the security interest becomes void is of particular significance in bankruptcy.    The bankruptcy judges of this district have consistently held that when a debtor rescinds a transaction, meaning that the court has determined that such a right was legally available, the security interest becomes void and the underlying claim becomes unsecured.[185]    In *In re Jaaskelainen*, I reasoned that once this occurs, the Bankruptcy Code presents a legal

---

[179] *See* Mass. Gen Laws ch. 140D, §§ 10(a), (f) (2005); 209 C.M.R. § 32.23(1)(c) (2005).

[180] *See* Mass. Gen Laws ch. 140D, §§ 10(b) (2005); 209 C.M.R. § 32.23(4) (2005).

[181] *Id.*

[182] *See United States v. Hernandez-Ferrer*, 599 F.3d 63, 67-68 (1st Cir. 2010).

[183] 209 C.M.R. § 32.23(4)(d) (2005).

[184] *See In re Giza*, 428 B.R. at 274-275.

[185] *Id*. at 275; *In re Jaaskelainen*, 391 B.R. at 645-646, *rev'd in part by Wells Fargo Bank, N.A. v. Jaaskelainen*, 407 B.R. at 461-462; *Myers v. Fed. Home Loan Mortg. Co. (In re Myers)*, 175 B.R. 122, 128-129 (Bankr. D. Mass. 1994); *Whitley v. Rhodes Fin. Servs., Inc. (In re Whitley)*, 177 B.R. 142 (Bankr. D. Mass. 1995).

impediment to a debtor's tender obligation and that in the context of a Chapter 13 case, 11

U.S.C. § 1322(a)(3) would prohibit a full tender to the now unsecured creditor unless all other

unsecured creditors received equal treatment.[186]    As aptly explained by Judge Boroff of this

district in *In re Giza*:

> When a security interest is voided, the underlying claim becomes unsecured, and
> the Bankruptcy Code provides for how all unsecured claims must be treated in
> bankruptcy by the Chapter 13 plan under 11 U.S.C. § 1322(a)(3). The debtor may
> designate unsecured claims into different classes, but only if the designation does
> not discriminate unfairly against any class so designated. 11 U.S.C. § 1322(b)(1).
> And once a class is designated, the plan must "provide the same treatment for
> each claim within a particular class . . ." 11 U.S.C. § 1322(a)(3). Tender in full . . .
> would violate the requirements of § 1322(a)(3) by giving [the creditor]'s
> unsecured claim preferential treatment. Even if practical, such a payment would
> rob other unsecured creditors of most, if not all, of the dividends on their
> unsecured claims. Inasmuch as [the creditor]'s unsecured claim would be no
> different in character as any other, classifying the claim differently would be just
> the type of unfair discrimination as is expressly prohibited by § 1322(a)(3).[187]

Therefore, in a Chapter 13 case, the bankruptcy court effectively modifies the procedure set forth

in 209 C.M.R. § 32.23(4)(c), as is contemplated by 209 C.M.R. § 32.23(4)(d), by requiring a

tender of the debtor's remaining obligation through the debtor's Chapter 13 plan in a manner

consistent with other similarly classified unsecured creditors.

Arguably, this view is also harmonious with both the legislative history of TILA and the

Official Staff Commentary to Regulation Z.  The legislative history of TILA states in relevant

part:

> *Upon application by the consumer or the creditor, a court is authorized to modify
> this section's procedures where appropriate. For example, a court might use this
> discretion in a situation where a consumer in bankruptcy or wage earner
> proceedings is prohibited from returning the property*. The committee expects
> that the courts, at any time during the rescission process, may impose equitable

---

[186] *In re Jaaskelainen*, 391 B.R. at 645-646.

[187] *In re Giza*, 428 B.R. at 275.

conditions to insure that the consumer meets his obligations after the creditor has performed his obligations as required under the Act.[188]

Similarly, the Official Staff Commentary[189] to the federal analog of 209 C.M.R. § 32.23(4)(d) explains that:

> The procedures outlined in § 226.23(d)(2) and (3) may be modified by a court. *For example, when a consumer is in bankruptcy proceedings and prohibited from returning anything to the creditor, or when the equities dictate, a modification might be made.* The sequence of procedures under § 226.23(d)(2) and (3), or a court's modification of those procedures under § 226.23(d)(4), does not affect a consumer's substantive right to rescind and to have the loan amount adjusted accordingly. Where the consumer's right to rescind is contested by the creditor, a court would normally determine whether the consumer has a right to rescind and determine the amounts owed before establishing the procedures for the parties to tender any money or property.[190]

While both recognize that a debtor in bankruptcy is legally prohibited from returning property to the creditor and suggest that a modification of the "procedures" in the regulation "might" be appropriate, neither explain the nature of such a modification.   I note, however, that the regulation's procedures require a consumer to tender back property received in the transaction, so a modification of that procedure might logically alter that requirement, particularly where the consumer's obligation, as recognized by both, is impacted by bankruptcy.

Admittedly, this is by far the minority position and my prior decision in *In re Jaaskelainen* was reversed on this point by Judge Zobel.[191]   In *Wells Fargo Bank, N.A. v. Jaaskelainen*, she concluded that I erred in finding that the debtors had been legally freed from their obligation to tender back the amounts that they had borrowed and that conditioning

---

[188] S.Rep. No. 96-368, at 29 (1980), *reprinted in* 1980 U.S.C.C.A.N. 236, 264–65 (emphasis added).

[189] "Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive . . . ." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980).

[190] 12 C.F.R. Pt. 226, Supp. I, 12 C.F.R. § 226.23(d)(4) (emphasis added).

[191] *In re Jaaskelainen*, 391 B.R. 627, *rev'd in part by Wells Fargo Bank, N.A. v. Jaaskelainen*, 407 B.R. 449.

rescission on such a tender would unfairly discriminate among unsecured creditors.[192]   Relying

heavily on the United States Court of Appeals for the Ninth Circuit's decision in *Yamamoto v.*

*Bank of New York*,[193] Judge Zobel found that because the security interest did not automatically

become void when the debtors sought rescission, I was entitled to determine whether they met or

could have met all the conditions for rescission, including any additional ones that I might

equitably impose, as part of my inquiry into whether rescission is available.[194]   Moreover, as she

had already found that the security interest had not terminated, she concluded that there was no

legal impediment to a full tender and that I was not barred from imposing such a condition on the

debtor's rescission.[195]   Ultimately, Judge Zobel remanded the matter for consideration of

appropriate conditions to impose on the debtor's exercise of rescission, explaining that:

> In undertaking this evaluation the bankruptcy court should consider traditional
> equitable notions, including such factors as the severity of Appellants' MCCCDA
> violation and the degree to which Debtors are able to pay the principal amount.[196]

Notwithstanding Judge Zobel's thorough and thoughtful analysis, I must respectfully

disagree in light of her reliance on *Yamamoto v. Bank of New York*.[197]   At first blush, *Yamamoto*

seems to echo the First Circuit in *Large v. Conseco Fin. Serv. Corp.*:

> In these circumstances [where the lender contests the ground upon which the
> borrower rescinds], it cannot be that the security interest vanishes immediately

---

[192] *Wells Fargo Bank, N.A. v. Jaaskelainen*, 407 B.R. at 458.

[193] *Yamamoto v. Bank of New York*, 329 F.3d at 1172.

[194] *Wells Fargo Bank, N.A. v. Jaaskelainen*, 407 B.R. at 459.

[195] *Id.* at 460-462.

[196] *Id.* at 462.

[197] Although I was bound to follow Judge Zobel's decision in *In re Jaaskelainen*, I am not bound to do so in other cases because the bankruptcy court is a unit of the district court, and in a multi-judge district, district court judges are not bound by each other's decisions.  *See, e.g., Bairstow v. Sullivan (In re Sullivan)*, 198 B.R. 417, 426 n. 34 (Bankr. D. Mass. 1996); *Cumberland Farms, Inc. v. City of Barnstable ( In re Cumberland Farms, Inc.)*, 175 B.R. 138, 140 n. 4 (Bankr. D. Mass.1994).

> upon the giving of notice. Otherwise, a borrower could get out from under a
> secured loan simply by claiming TILA violations, whether or not the lender had
> actually committed any. Rather, under the statute and the regulation, the security
> interest "becomes void" only when the consumer "rescinds" the transaction. In a
> contested case, this happens when the right to rescind is determined in the
> borrower's favor.[198]

Here, both the First and Ninth Circuits focus on the same conceptual problem-- namely, that in

order to exercise a right to rescind and therefore void the security interest, the borrower must

actually have such a right.  *Yamamoto*, however, goes further to place non-statutory and non-

regulatory conditions on the legal availability of the right to rescind based upon the court's

"equitable discretion to modify rescission procedures."[199]  Relying on TILA's legislative history,

the Ninth Circuit concluded that doing so:

> [C]omports with congressional intent that "the courts, at any time during the
> rescission process, may impose equitable conditions to insure that the consumer
> meets his obligations after the creditor has performed his obligations as required
> by the act."[200]

Although this proposition is widely accepted,[201] I fail to see why resort to the legislative

history is necessary or appropriate.   The Supreme Court has explained that "[g]iven [a]

straightforward statutory command, there is no reason to resort to legislative history."[202]  Indeed,

"we do not resort to legislative history to cloud a statutory text that is clear"[203] and "[w]e do not

---

[198] *Yamamoto v. Bank of New York*, 329 F.3d at 1172.

[199] *Id.* at 1173.

[200] *Id.* (*quoting* S. Rep. No. S.Rep. No. 96-368, at 29 (1980) (1980), *reprinted in* 1980 U.S.C.C.A.N. 236, 265).

[201] *See, e.g.*, *American Mortg. Network v. Shelton*, 486 F.3d at 820-821; *Williams v. Homestake Mortg. Co.*, 968
F.2d 1137, 1140 (11th Cir. 1992); *FDIC v. Hughes Dev. Co.*, 938 F.2d 889, 890 (8th Cir. 1991); *Brown v. Nat'l
Perm. Fed. Sav. and Loan Ass'n*, 683 F.2d 444, 447 (D.C. Cir. 1982); *Rudisell v. Fifth Third Bank*, 622 F.2d 243,
254 (6th Cir. 1980); *Rachbach v. Cogswell*, 547 F.2d 502, 505 (10th Cir. 1976).

[202] *United States v. Gonzales*, 520 U.S. 1, 6 (1997).

[203] *Ratzlaf v. United States*, 510 U.S. 135, 147 (1994).

start from the premise that [the statutory] language is imprecise."[204]   To the contrary, "we
assume that . . . Congress said what it meant."[205]   Additionally, Regulation Z is "binding in the
courts unless procedurally defective, arbitrary or capricious in substance or manifestly contrary
to the statute."[206]   Both the CCCDA and the regulations contain clear directives as to the
procedures for rescission and how courts might modify those procedures.  Notably, the word
"condition" is absent from both.[207]   If this Senate Report is to be given any weight at all, it must
be read in a manner consistent with the limitations imposed by 12 C.F.R. § 226.23(d)(4) and 209
C.M.R. § 32.23(4)(d) and not used to circumvent their inherent inabilities.

Even assuming, *arguendo*, that Congress intended the courts to wield the power to
impose "equitable conditions" on rescission, it does not necessarily follow that the bankruptcy
court can condition rescission on the borrower's full tender of property received.[208]   As reiterated

---

[204] *United States v. LaBonte*, 520 U.S. 751, 757 (1997).

[205] *Id.*

[206] *Household Credit Servs. v. Pfennig*, 541 U.S. at 242.

[207] The Ninth Circuit further stated that:

> As rescission . . . is an on-going process consisting of a number of steps, there is no reason why a
> court that may alter the sequence of procedures *after* deciding that rescission is warranted, may not
> do so *before* deciding that rescission is warranted when it finds that, assuming grounds for
> rescission exist, rescission still could not be enforced because the borrower cannot comply with
> the borrower's rescission obligations no matter what.

*Yamamoto v. Bank of New York*, 329 F.3d at 1173 (emphasis in original).  While I agree there is a common sense
appeal to this point, the First Circuit reminds us "the purpose of the TILA's reordering of common law rescission
rules is to put the consumer in a stronger bargaining position."  *Large v. Conseco Fin. Serv. Corp.*, 292 F.3d. at 55-
56.  The Ninth Circuit's view mandates a full tender of all property the borrower received as a condition to
rescission in every case.  Not only does this improve the creditor's status simply by virtue of its objection without
regard to merit, but this approach effectively rewrites the statute and regulations.  If that result is truly what
Congress had intended, it would be in the statute itself and courts would not need to rely on a cryptic passage of a
Senate Report to divine Congress' will.

[208] I am aware that other courts have imposed such a condition in the bankruptcy context.  *See, e.g.*, *Yamamoto v.
Bank of New York*, 329 F.3d at 1171 (recognizing that the equities favored the creditor who would otherwise have
been left in an unsecured position in the borrower's intervening bankruptcy); *Quenzer v. Advanta Mortg. Corp.
USA*, 288 B.R. 884, 886–89 (D. Kan. 2003) (reversing the bankruptcy court's finding that it could not condition
rescission on tender); *Ray v. CitiFinancial, Inc.*, 228 F.Supp.2d 664, 668–669 (D. Md. 2002) (reversing the

by the Supreme Court in *Marrama v. Citizens Bank of Massachusetts*, "a bankruptcy court's general and equitable powers 'must and can only be exercised within the confines of the Bankruptcy Code.'"[209]  Not only would such a condition not fall within the court's power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" as granted by 11 U.S.C. § 105(a), but to the extent that the creditor would otherwise be left unsecured, a condition of full tender would undermine the purposes of the Bankruptcy Code and do violence to its provisions. [210]  While this may mean that sometimes the debtor will have enjoyed the full benefits of the bargain to the creditor's detriment, that results from the creditor's failure to follow the requirements of the statute.  On the other hand, "[i]t would be palpably unfair to deny the relief to which a consumer is entitled under TIL[A] because that consumer has also availed himself of bankruptcy relief. To do so would require that the consumer choose between bankruptcy and TIL[A], something neither form of statutory relief contemplates."[211]

Recognizing that no Massachusetts appellate court has addressed these issues, the Debtors ask that I seek clarification from the Supreme Judicial Court to resolve the conflict

---

bankruptcy court's order rescinding creditor's lien without conditioning it upon a tender in full); *Webster v. Centex Home Equity Corp. (In re Webster)*, 300 B.R. 787, 802 (Bankr. W.D. Okla. 2003) (adopting *Quenzer's* reasoning); *Apaydin v. Citibank Fed. Savs. Bank (In re Apaydin)*, 201 B.R. 716, 724 (Bankr. E.D. Pa. 1996) (rescission without tender is a disproportionate punishment); *Thorp Loan and Thrift Co. v. Buckles (In re Buckles)*, 189 B.R. 752, 763–766 (Bankr. D. Minn. 1995) (bankruptcy courts refusing to condition rescission on tender ignore that the remedy is an equitable one); *Lynch v. GMAC Mortg. Corp. of Iowa (In re Lynch)*, 170 B.R. 26, 30 (Bankr. D.N.H. 1994) ("This Court can see no reason why the circuit courts and the district court[s], in exercising their equitable powers, can condition the right of rescission, but the bankruptcy court cannot.").

[209] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 382 (2007) (*quoting Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)).

[210] It is a cardinal rule of statutory construction that when two federal statutes address the same subject, courts must try to give effect to both.  *United States v. Borden Co.*, 308 U.S. 188, 198 (1939).

[211] *In re Piercy*, 18 B.R. 1004, 1007 (Bankr.W.D. Ky. 1982).  *See In re Giza*, 428 B.R. at 275.  For this reason, I do not agree with the Ninth Circuit's characterization of the voiding of the security interest as a "procedure," as its modification would substantively effect whether a debtor could rescind at all.  *See Yamamoto v. Bank of New York*, 329 F.3d at 1171-1172.

between the federal decisions in this district.    Nonetheless, I cannot certify the questions

presented by the Debtors because the bankruptcy court is not identified as one of the courts from

which the Supreme Judicial Court can accept certified questions.[212]    Moreover, the questions are

too generally phrased to warrant certification as they are clearly answered by the statute itself.

The question is not whether the security interest is voided as a matter of law without regard to

the consumer's tender obligation, but whether the court has the *equitable discretion* to condition

the availability of the right to rescind on such a tender.

Therefore, for all the reasons explained above, I will not require the Debtors to tender

back all property received from the Countrywide as a condition to their rescission of the

refinancing transaction.[213]

### G.  Determination of the Amount of Countrywide's Claim

Pursuant to Mass. Gen. Laws ch. 140D, § 10(b), "when an obligor exercises his right to

rescind . . . he is not liable for any finance or other charge" and "the creditor shall return . . . any

money or property given as earnest money, down payment, or otherwise."    Finance charges are

defined "as the sum of all charges, payable directly or indirectly by the person to whom the

credit is extended, and imposed directly or indirectly by the creditor as an incident to the

---

[212] S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981) ("This court may answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, or of the District of Columbia, or a United States District Court, or the highest appellate court of any other State when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this court.").    *See May v. Suntrust Mortg., Inc. (In re May)*, No. 10-1176, 2011 WL 4102805 *10 (Bankr. D. Mass. Sept. 14, 2011).

[213] I further note that even if Judge Zobel's view is correct and I should impose appropriate equitable conditions on the Debtors' right to rescind, the result in this case would be the same in light of the treatment that Countrywide's claim must receive through the Debtors' plan.

extension of credit."[214]   Moreover, the CCCDA specifically identifies the following types of

charges as finances charges:

> (1) Interest, time price differential, and any amount payable under a point,
> discount, or other system of additional charges.
> (2) Service or carrying charge.
> (3) Loan fee, finder's fee, or similar charge.
> (4) Fee for an investigation or credit report.
> (5) Premium or other charge for any guarantee or insurance protecting the creditor
> against the obligor's default or other credit loss.
> (6) Borrower-paid mortgage broker fees, including fees paid to the broker or to
> the lender for delivery to the broker, whether such fees are paid in cash or
> financed.[215]

The Federal Reserve Board has further clarified that the amount to be refunded includes:

> finance charges already accrued, as well as other charges, such as broker fees,
> application and commitment fees, or fees for a title search or appraisal, whether
> paid to the creditor, paid directly to a third party, or passed on from the creditor to
> the third party.[216]

In the present case, the parties have stipulated to all the figures involved.  Starting with

the principal loan balance as of May 2, 2011, of $333,954.47, I must at least deduct the following

amounts paid by the Debtors: $19,515.10 in loan interest payments; $136.82 in late charges;

$4,529.59 applied to the loan escrow account; and $12,805 paid to Countrywide and other third

parties in connection with the refinancing transaction.[217]  This initially yields an adjusted balance

of $296,967.96.

The final issue is whether the $30,039.69 in past accrued and unpaid loan interest that

was rolled into the principal balance as a result of the two loan modification agreements is

properly classified as interest or principal for the purpose of determining the post-rescission loan

---

[214] Mass. Gen. Laws ch. 140D, § 4(a).

[215] *Id.*

[216] 12 C.F.R. Pt. 226, Supp. I., 12 C.F.R. § 226.23(d).

[217] JPTS at II.21, 25-27, 31-32.

balance.  The Debtors argue that "[l]oan interest is the most basic finance charge" and the fact that the parties "chose to roll interest into principal for modification purposes does not alter the fact that it was a finance charge which resulted directly from the [refinancing transaction] . . . [and] is no longer owed."[218]  Put another way, "rescission . . . automatically voids or nullifies the subsequent modification agreement, so the capitalized amount reverts to interest."[219]   The Debtors do not cite any authority in support of this proposition.

Ultimately, I find that the Debtors' arguments make too little of the loan modification agreements.  Indisputably, the amount in question was interest, but the Debtors executed two binding agreements for the express purpose of modifying their loan to treat that interest as principal and postpone foreclosure.  They offer no compelling explanation why those loan modification agreements should not be given effect.  To the contrary, rescission in this case must rescind the refinancing transaction as subsequently modified.  Therefore, I will not deduct the $30,039.69 in capitalized interest from the adjusted balance, but find that the amount of Countrywide's claim is $297,967.96.

H.  Treatment of Countrywide's Claim

Having determined that the Debtors exercised a right to rescind that was legally available to them in light of the Defendants' failure to clearly and conspicuously disclose the right to rescind, the Mortgage is void as a matter of law and Countrywide now holds an unsecured claim in the amount of $297,967.96.  Consistent with my prior decision in *In re Jaaskelainen* and Judge Boroff's decision in *In re Giza*, the Debtors must appropriately classify and treat Countrywide's claim consistently with those of other unsecured creditors.  Therefore, to the

---

[218] Plaintiffs' Post-Trial Memorandum of Law, Docket No. 159 at 20.

[219] *Id.* at 21 n.19.

extent that Countrywide's claim purports to be secured or seeks any amount above the post-rescission balance, the Objection to Claim is sustained.  Similarly, to the extent that the Objection to Confirmation is based upon the fact that the refinancing transaction was not rescinded, it is overruled.

Nonetheless, having reviewed the Debtors' case and the Plan, I find that there may yet be a problem with the treatment of unsecured claims in light of the Debtors' reliance on a Homestead Exemption in the amount of $500,000 in their liquidation analysis.  Pursuant to Massachusetts Local Bankruptcy Rule 1009-1, a party filing an amendment to the schedule of exemptions after the deadline for objecting to the exemptions must "file a motion with the Court for approval of the amendment."[220]  Moreover, motions must be accompanied by a certificate of service that "lists the name and address of each person and attorney served with the pleading . . . ."[221]  Specifically, the Federal Rules of Bankruptcy Procedure require schedule amendments to be served on "the trustee and to any entity affected thereby."[222]

Here, the Debtors sought to Amend Schedule C to increase their Homestead Exemption from $39,534.80 to $500,000 by filing the Notice of Amendment.  As the meeting of creditors concluded on September 23, 2008, the deadline to file objections to the Debtors' claim of exemptions expired on October 23, 2008.  Therefore, because the Debtors' amendment was filed four months after that deadline, they were required to file a properly served motion seeking court approval for the amendment.  Further compounding the problem, the accompanying certificate of service neither complied with the local rules nor evidenced service on all affected parties.

---

[220] Massachusetts Local Bankruptcy Rule ("MLBR") 1009-1.

[221] MLBR 9013-3(a), (c).

[222] Fed. R. Bankr. P. 1009(a).

This error is not insignificant.  With the Mortgage voided, the Debtors' equity in the Property increases by $349,065.20.  In a Chapter 7 liquidation and in the absence of a valid claim of exemption, this equity would need to be devoted to the payment of unsecured creditors which would generate a dividend of approximately 85%.  Because the Plan contemplates a dividend to unsecured creditors of approximately 2.6%, *all creditors* were entitled to proper notice and an opportunity to object.  Therefore, I will order the Debtors to file a motion to amend Schedule C that is properly served on all creditors.

I.  Damages, Costs, and Attorney's Fees

Mass. Gen. Laws ch. 140D, § 32 provides that when a creditor fails to comply with any requirement under the CCCDA or enabling regulations, the borrower may recover actual damages, statutory damages of not less than two hundred dollars or greater than two thousand dollars, and costs and reasonable attorney's fees incurred to enforce successfully the foregoing liability or the right to rescind.[223]  Statutory damages, however, are limited to a single recovery even where there are multiple obligors.[224]

In the present case, the Debtors have not alleged any actual damages resulting from the Defendants' failure to comply with the CCCDA and its regulations.  While they are entitled to statutory damages, I find that $200 is sufficient given that they have been partially relieved of their obligation to tender back the funds loaned and Countrywide's claim will be treated as an unsecured claim in their bankruptcy.  To the extent that the Debtors' are entitled to costs and reasonable attorney's fees, I will order them to file a fee application within thirty days.

---

[223] Mass. Gen. Laws ch. 140D, § 32(a) (2005).

[224] Mass. Gen. Laws ch. 140D, § 32(d) (2005).

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter judgment in favor of the Debtors on Counts I and II

of their Complaint and enter an order directing them to file a fee application within thirty days,

sustaining the Objection to Claim, and overruling the Objection to Confirmation.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: September 27, 2011

Counsel Appearing:

    Kenneth D. Quat, Quat Law Offices, Cambridge, MA,
        for the Debtors
    Richard L. Blumenthal, Silverman & Kudisch, P.C., Newton, MA,
        for the Debtors
    Matthew G. Lindenbaum, Natalie F. Langlois, Goodwin Proctor LLP, Boston, MA,
        for the Defendants
    John T. Precobb, Orlans Moran PLLC, Boston, MA,
        for Countrywide Home Loans, Inc.
    Amy N. Azza, Orlans Moran PLLC, Boston MA,
        for Countrywide Home Loans Servicing, L.P.